GATTIE A. BAILEY, Administratrix, v. NORTH CAROLINA
R. R. COMPANY.

(Filed 19 November, 1908).

1  Railroads—Duty to Employees—Trespassers.

A railroad company does not owe the same duty to one who
has surreptitiously climbed, in the night, upon the tender of its
switching engine, being used around its extensive and dangerous
railroad yards at its station, as it does to its employees; and no
invitation to do such an act can be implied from such conditions
and surroundings.

2. Railroads—Wanton Negligence—Evidence—Insufficient.

Mere forgetfulness, whatever the consequence, does not con-
stitute a wilful or wanton neglect of duty; for the words imply
that the act was knowingly and purposely done. Therefore,
when the evidence does not disclose that leaving a switch open,
which caused the injury, was knowingly done, or done in utter
disregard of the consequences, it is not sufficient to sustain a
verdict for damages found to be occasioned by "wanton negli-
gence" on the part of the railroad company, or its employees.

3. Pleadings—Allegations—Proof—Evidence.

Allegations of the complaint sufficient to sustain a verdict of
damages for wanton negligence are ineffectual when not sustained
by the proof.

ACTION tried before *Moore, J.,* and a jury, at the February
Term, 1908, of GUILFORD.

The action was brought by plaintiff as administratrix of
her son, W. L. Bailey, for damages for the death of intestate,
alleging that the same was caused by the wilful negligence
of the defendant's lessee, the Southern Railway.

The Court submitted these issues:

"1. Was the plaintiff's intestate injured and killed by the
wanton negligence of the defendant's lessee? Answer: 'Yes.'

"2. What damage, if any, has plaintiff sustained? Answer:
'$7,000.' "

At the conclusion of the evidence the defendant moved to

nonsuit.   Motion denied.   Defendant excepted.   From the
judgment rendered the defendant, appealed.

The facts are stated·in the opinion of the Court.

*Stedman & Cooke* for plaintiff.
*Wilson & Ferguson* for defendant.

BROWN, J.   The lessee of the defendant operates certain
large switching yards near Greensboro, called. the Pomona
Yards, in which are laid a number of parallel tracks upon
which are constantly running the switch engines, transfer
trains and the other trains of the company.

Two of these tracks are known as the main line tracks, one
for southbound ·and the other for northbound trains.

There is a crossover switch used by trains when necessary
in crossing from one main line track to the other.

The plaintiff's intestate was on switch engine No. ·1688
on the night of 11 February, 1906, and was killed in a col-
lision near this switch in the Pomona Yards with train No.
34, a northbound passenger train. ·

The evidence offered in the case, except one rule of the
company, was introduced by plaintiff.

All the evidence bearing on this unfortunate disaster is
that of C. T. Malcolm, a brakeman and a survivor of the
crew of the wrecked switch engine, who testifies, substantially,
as follows:   "I was ·working on the yard at Greensboro on
·11 February, 1906.   Was on engine No. 1688, a switch
engine.   I was at the yard about the time, or just before,
train No. 34 was due from the South, and went with the
engine to the coal chute after water.   There are parallel
tracks in the yard, southbound track and northbound track;
all trains going from Greensboro to Charlotte go on the south-
bound and all trains coming to Greensboro from Charlotte,
on northbound.   The. track that lies nearest south is the·
northbound track; the track that lies nearest north, is the
southbound.   Engineer Sellers, Conductor Newman, Cary

Saunders and myself were on the switch engine. As we were going down to get water, we saw another train going up toward the yard; a transfer crew was standing on southbound main line when we came out of the new yard; that transfer train had somewhere between twenty-five and fifty cars. The engine was shoving the cars. The engineer of the train was Mr. Allred, and the brakemen were Will Logan and C. T. Welker.

"When an engine is proceeding backwards through a switch, the rear man opens it; the one next to the engine is supposed to close it. C. T. Welker was the front brakeman on this train.

"After we had gotten water, I first saw the deceased, W. L. Bailey, when we were about two-thirds of the way back to the new yard; he came over the back of the tender and sat down on the coal gate of the tender. As we got to the switch we could see the headlight of No. 34 coming toward Greensboro; just ahead of us was the switch. Somewhere between five and fifteen minutes before we got to the switch, the transfer train had backed through there, it went across. When No. 34 got to the place where the switch was, it came through the switch, it went from the northbound track to the southbound track and there was a wreck with the switch engine No. 1688. I had seen W. L. Bailey just before this wreck, from a minute to three minutes before. The last I saw of him he was sitting on the coal gate; a gate that holds the coal in the tender. He was laughing and talking with Conductor Newman and Fireman Johnson; they are both dead. Henry Sellers, who was on the engine, is dead. All killed at that wreck. I was in about thirty feet of the engine when the wreck occurred, was going toward the switch. I do not know, but the switch must have been open. I saw the switch after the collision, somewhere less than fifteen minutes. I think Mr. Hinton was with me, Mr. Hinton and all met at the switch about the same time. It was open at that time.

The lock was found at the switch stand. I saw the lock, it was not mutilated.

"I saw Bailey after the wreck, he was down in the coal; I did not see him taken out."

Upon cross-examination the witness stated that Bailey, the deceased, was not a member of the switch engine crew. The first thing he saw of W. L. Bailey after they got the water, was when the pipe was thrown around and some water was thrown over the back of the tender, and the engineer, who was giving the engine water, remarked that he came mighty near drowning somebody. After the engine started to the new yard and while the engine was going up to the yard, W. L. Bailey climbed from back of the tender over on the coal and sat down on the coal. No one gave him permission to come on the engine.

The witness further testifies: "I do not know whether the switch was left open or not; I could not say that it was left open; I don't know whether it was locked at the time the collision occurred or not; I do not know whether the lock was taken out afterwards and laid *down there* or whether it was out at the time of the collision. I do not know who left the switch open, if it was open. Neither I nor any member of the crew of the engine I was on knew anything about it being open. I do not know whether No. 34, when it came in, ran through an open switch or from some other reason it crossed over."

The witness further said that the transfer train Welker was on had passed over the switch "about fifteen or twenty minutes" before the collision, and that it was Welker's duty when his train passed to close the switch.

The rules of the company introduced in evidence require that switches be kept locked for the main track, except when passing trains to or from another track, and also forbids any person to ride on the tenders and engines of the company, except certain designated employees and officials:

· It is admitted in the record that the deceased was not an employee of the company.

. 1. It must be conceded at the outset that the company did not owe to the deceased the duty it owed its employees rightfully on the switching engine, for the deceased was wrongfully there, and in violation of the company's rules, a copy of which was found in his possession.

He was a trespasser in entering upon the company's switching yards and climbing up at night on the back of a moving tender. He was not invited by the crew; and they had no such authority. *Vassor v. R. R.,* 142 N. C., 68; *Peterson v. R. R.,* 143 N. C., 260.

Not only did the published rules of the company prohibit such conduct, but the dictates of common prudence forbade it. In a railway switching yard in which there are numerous tracks in constant use for the purpose of switching cars, making up trains, and the like, and where the extremely dangerous character of the place is perfectly manifest to all, there can be no implied license to the public to enter. *R. R. v. Rylee,* 87 Ga., 491; *Wagner v. R. R.,* 122 Iowa.

And certainly, for still stronger reasons, there can be no implied license to climb up surreptitiously on the company's engines and tenders and distract the attention of the crew from their exceedingly important duties.

2. There is no evidence that the deceased was killed by any wilful or wanton negligence of the defendant's lessee, and therefore his Honor should have sustained the motion to nonsuit.

There is evidence tending to prove that the transfer train passed over the switch from fifteen to twenty minutes prior to the collision, and that it was Brakeman Welker's duty to close the switch. Although there is no positive evidence, it may be inferred from the fact that the switch was open that Welker failed to lock it when his train passed over, but there

is a conspicuous absence of any fact tending to show why he failed to lock it.

So far as the evidence discloses, it was the old case of "I forgot," which has cost thousands of lives before this sad occurrence took place. We have in the books other cases where engineers, conductors and switchmen have forgotten their orders and brought disaster to themselves, their passengers and employers. But mere forgetfulness, however grievous the consequences, does not constitute a wilful or wanton neglect of duty. The Indiana Court says, that "to constitute a wilful injury the act which produced it must have been intentional, and must have been done under such circumstances as evinced a reckless disregard for the safety of others, and a willingness to inflict the injury complained of." *R. R. Co., v. Bryan,* 7 N. E. Rep., 808. To same effect is *R. R. Co. v. Murphy,* 9 Bush., 528; *R. R. v. Filburn,* 6 Bush., 574; *Bridge Asso. v. Loomis,* 20 Ill., 236; Beach on Neg., sec. 64.

The term "wanton negligence" (whether correctly joined it is needless to discuss) always implies something more than a negligent act. This Court has said that the word "wanton" implies turpitude, and that the act is committed or omitted of wilful, wicked purpose; that the term "wilfully" implies that the act is done knowingly and of stubborn purpose, but not of malice. *State v. Massey,* 97 N. C., 468; *State v. Brigman,* 94 N. C., 888.

Judge Thompson says: "The true conception of wilful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract or which is imposed on the person by operation of law."

·"Wilful or intentional negligence is something distinct from mere carelessness and inattention, however gross."

"We still have two kinds of negligence, the one consisting of carelessness and inattention whereby another is injured in his person or property, and the other consisting of a wilful

and intentional failure or neglect to perform a duty assumed by contract or imposed by operation of law for the promotion of the safety of the person or property of another." Thompson on Neg. (2 Ed.), sec. 20, *et seq.*

It was held in the case of *Bowlin v. R. R. Co.,* 19th American and English Railroad Cases (new series), pp. 735 to 749, that a trespasser could not recover for an injury alleged to have been caused by the wanton negligence of the railroad through its conductor, "unless the misconduct of the trainman was of that degree necessary to render the fact that the deceased was a wilful trespasser immaterial, that is, unless his conduct was such as to evince an intention to injure the deceased or such an utter disregard of the consequences of his act as to indicate that willingness to injure him, which is equivalent in respect to legal damages to intent to procure the result."

The fact that the complaint charges that the act of omission imputed to Welker was wilfully, recklessly as well as wantonly done, does not help the plaintiff, even if such words were all used in the issue.

The word "recklessly," when used conjunctively with wantonly, always means something more than negligently; the two words thus conjoined can never import less than such conscious disregard of or an indifference to the probable consequences of the act to which they refer as is the legal equivalent of wilful misconduct and intentional wrong. *R. R. v. Robinson,* 19th American and English Railroad Cases, N. S., p. 357.

The plaintiff must do more than characterize the alleged omission of duty upon the part of Welker in her complaint. She must offer evidence tending to give it the character she imputes to it.

There is no evidence of a deliberate or wilful purpose on the part of any employee of the defendant's lessee to injure plaintiff's intestate, or of a wilful or conscious indifference

to consequences whereby plaintiff's intestate was killed; there is no evidence that Welker knew that engine No. 1688 was standing on the southbound track near the switch, or that the intestate was on it; on the contrary, it appears that the switch engine passed the transfer train while on its way to Greensboro for water, and the transfer train had passed through the crossover switch before said engine returned to the switch. There is no evidence that Welker or any of the crew of the transfer train knew that train 34 was coming in on the northbound track shortly thereafter; the only evidence that the switch was left open is that it was found open fifteen minutes after the wreck, and there were from five to fifteen minutes between the time the transfer train passed through the switch until the wreck, so that the switch was found open from twenty to thirty minutes after the transfer train had gone through.

Conceding that Welker left the switch open, this evidence does not at all negative the fact that it was mere forgetfulness or a careless mistake having no evil intent or purpose; nor any *consciousness* of probable injury.

The Court below erred in refusing the motion to nonsuit.

It is so ordered.