MARY BRASWELL, GUARDIAN OF TYLUS RHONE, MINOR v. N. C. A & T STATE UNIVERSITY

No. 6918IC55

(Filed 18 June 1969)

1. **State § 5— Tort Claims Act — injuries compensable**

  Injuries intentionally inflicted by employees of agencies of the State are not compensable under the Tort Claims Act.

2. **State § 8— tort claim proceeding — sufficiency of evidence to show intentional tort**

  In a Tort Claims Act proceeding instituted by a minor plaintiff against a state university to recover for injuries resulting from a bullet fired by a university security officer, evidence that the university assigned the officer to a gymnasium in which a dance was being held, that a group of people made repeated attempts to enter the gymnasium illegally through a locked side door, that the security officer opened the door and saw 100 to 150 people gathered outside, many of whom were intoxicated and in a belligerent mood, that the officer, who had been on continuous duty for 16 hours, was afraid for his safety, that he fired two shots from his pistol downward to the ground in order to disperse the crowd, that the officer stated that the first shot went off intentionally but that he had no explanation as to the second shot, and that the plaintiff, who was standing in the crowd, was struck by one of the bullets, *is held* not to establish as a matter of law that the officer's act was so grossly and wantonly negligent as to constitute an intentional tort.

3. **Trial § 18— trial by jury — province of court and jury**

  In a jury trial the court declares and explains the law arising on the

evidence in the case; guided by these instructions, the jury resolves the disputed facts and by its verdict declares the ultimate finding.

**4. Master and Servant § 93— function of the Industrial Commission**

In proceedings before the Industrial Commission, the Commission makes both findings of fact and conclusions of law.

**5. Appeal and Error § 26— exception to signing of order**

An exception to the signing of an order presents for review the question whether the facts found support the conclusions of law.

**6. Appeal and Error § 26— effect of appeal — review of findings of fact**

An appeal alone, or an exception to the judgment, does not present for review the findings of fact or the sufficiency of the evidence to support them.

**7. State § 10— tort claim proceeding — review of Commission's determinations**

The determinations of negligence, proximate cause, and contributory negligence are mixed questions of law and fact in a proceeding under the Tort Claims Act and are reviewable on appeal from the Industrial Commission, and the designation "Finding of Fact" or "Conclusion of Law" by the Commission is not conclusive.

**8. State § 8— tort claim proceeding — contributory negligence**

In a proceeding under the Tort Claims Act by a minor plaintiff to recover for injuries resulting from a bullet fired by a state university security officer, the Industrial Commission's findings of fact that the university assigned its security officer to a gymnasium in which a dance was being held, that the plaintiff joined a crowd of people who were attempting to gain illegal entry into the gymnasium through a locked side door, although plaintiff did not physically participate in shaking and breaking in the door, that the security officer appeared at the door and twice fired his gun at the ground in order to disperse the crowd, and that plaintiff was struck by a bullet, *are held* to establish that plaintiff was contributorily negligent as a matter of law in joining the crowd, since it was reasonably foreseeable that the officer would perform his duty to prevent an illegal entry into the building.

**9. Negligence § 1— act constituting negligence — mob action**

Every person is charged with the duty of exercising reasonable care for his own safety, and the joining in illegal mob action is not an exercise of reasonable care.

APPEAL by defendant from the Full Industrial Commission.

Plaintiff instituted this action before the North Carolina Industrial Commission under the State Tort Claims Act. G.S. 143-291 *et seq.*

After hearing, a deputy commissioner awarded plaintiff $10,000. Defendant appealed to the Full Commission. The Full Commission

overruled defendant's exceptions, affirmed the deputy commissioner with the exception that the words "Moore Gymnasium" was inserted in lieu of the words "student union" in finding of fact No. 9 and the hospital bills were corrected to conform to the evidence and the award reduced accordingly from $10,000 to $9,940.

The findings of fact and conclusions of law as amended by the Full Commission are as follows:

### "FINDINGS OF FACT

1. Plaintiff is a colored male, age 18, who resides with his guardian, Mary Braswell, at 413 S. O'Henry Boulevard, Apartment 16, Greensboro, North Carolina.

2. On October 14, 1967, about 2:00 a.m., the claimant in the company of several others including one Braswell went to the Moore Gymnasium at A & T College, Greensboro, for the purpose of attending a public dance which was to begin at 2:30 a.m.

3. Upon arriving at the gym the claimant and his companions observed a long line of people in front of the gym at the ticket booth. Plaintiff and his companions got into the line for the purpose of purchasing a ticket to the dance. The line was moving slowly. After waiting in line for about 15 minutes, they got out of the line and went around to the west side of the gym where there was a side door.

4. When the claimant and his companions went to the west side of the building, there were 75 to 100 people near the side door. Some 12 to 15 persons were at the door shaking it. The door had a chain around it to keep people out of the building. There were no tickets to be sold at the west side entrance. Some of plaintiff's companions including Braswell went upon the stoop to the door and began shaking and rattling the door. Johnnie Marable, Sr., the security officer for A & T College came to the door and told the crowd to go away and quit shaking and rattling the door. The people shaking the door then quit and backed away from the door.

5. Claimant and his companions then returned to the front door of the gym and again got into the line of people who were waiting to purchase a ticket. After waiting in line for some several minutes and not being able to get to the ticket booth, they returned to the west side of the building.

6. There were some 75 to 100 people gathered at the west side near the entrance and some 12 to 15 persons including Braswell

proceeded to shake and rattle the door attempting to get inside. The claimant did not participate in the shaking and rattling of the door. Marable again came to the door and instructed the crowd of people to leave and stop shaking the door. At this point the plaintiff went around to the front of the building to see a friend of his.

7. For the third time some 12 to 15 persons began rattling the west side doors and Marable again came from the inside of the building to the west side doors. He opened a door and stepped outside on the stoop. The 12 to 15 people in front of him backed up. Marable looked to either side and saw many people on each side of him. They were in a belligerent mood. Marable had drawn his gun and as the crowd was not disbursing (sic), he fired the gun which was pointed downward into the ground two times. He intended to fire the gun the first time. There is no explanation why the second shot was fired. After firing his gun, Marable went back into the building.

8. Claimant was walking back from the front of the building toward the west side doors when Marable fired his gun and was about 35 feet from the side door standing on the sidewalk when a bullet fired from Marable's gun struck his left front chest, to the left of and over his heart. Claimant turned to run but collapsed in an unconscious state. Plaintiff was very seriously injured.

9. Security Officer Marable had been on duty longer than his usual tour of duty. He was tired. The crowd was unruly and some had been drinking. It was Marable's thinking that the crowd was trying to break into the student union (corrected by Full Commission to Moore Gymnasium). Marable was afraid for his safety. Marable fired the gun, a .38 calibre revolver, as he thought that was the only way he could disburse (sic) the crowd.

10. There were several witnesses who saw Marable fire his gun. Marable had no intention of hitting any individual. He did not know the plaintiff although he knew Braswell who worked at the college. The crowd did not move toward Marable and no threat was made upon him before he fired the gun, but thereafter there were threats against him. Marable had never before had to use his gun in his line of duty.

11. While the plaintiff had been in the crowd assembled near the doors on the west side of the building he never participated

in the shaking and rattling of the doors in an attempt to gain entrance. Plaintiff would have gone inside if the doors had been opened.

12. Officer Cooper of the Greensboro Police Department was called to the scene but had difficulty getting to the place the plaintiff had been shot due to the large crowd of people. Officer Cooper stated that there were two to three thousand people in the general area. Some of the crowd had been drinking, were belligerent, cursing and making threats on Marable's life. No investigation was made at that time as the officer was afraid for his life.

13. After plaintiff was shot and lying on the ground he was assisted by a student by the name of Perry. An ambulance was summonsed (sic) and upon its arrival the plaintiff was carried to the hospital where he was admitted and treated by Dr. Watkins. Plaintiff was given oxygen and medication. The bullet was removed by surgical means. Plaintiff suffered intense pain and developed a respiratory difficulty. Plaintiff was hospitalized on October 14, 1967 and was treated there until November 28, 1967. He was thereafter treated as an outpatient. Plaintiff's doctor's bills were in the amount of $325.00 and his hospital bill is in the amount of $1,766.75 (corrected by Full Commission to $1,706.75). It was Dr. Watkins' opinion that the plaintiff's prognosis was good and that he will be all right. At the time of his injury plaintiff was employed at Bates Nightwear at Greensboro, North Carolina at a weekly wage of $66.00, and he has not worked regularly since his injury.

14. Officer Marable knew that a large crowd of people was near the west entrance door of the gym and that there were concrete sidewalks in the area and that the firing of his gun into the ground would likely cause injury to someone in the crowd and in so doing committed a negligent act.

15. While the plaintiff was in the crowd near the west side entrance to the gym, there was no contributory negligence on his part.

16. Plaintiff has been damaged in the amount of $10,000.00 (corrected by Full Commission to $9,940.00) as a result of the negligent act of Officer Marable who was an employee of A & T College, an agency of the State of North Carolina, and was

acting at the time of the incident in question within the course and scope of his employment.

\* \* \*

The foregoing findings of fact and conclusions of law engender the following additional

### CONCLUSIONS OF LAW

Officer Marable, an employee of A & T College, an agency of the State of North Carolina, while acting in the course and scope of his employment committed a negligent act by firing his gun into the ground where a large group of people were assembled. Said negligence was the proximate cause of the injury sustained by the plaintiff. Officer Marable did not act as a reasonable and prudent man would have acted under the same or similar circumstances. G.S. 143-291 *et seq; Lowe v. Department of Motor Vehicles,* 244 N.C. 353; 60 A.L.R. 2d 875, (cases cited).

There was no contributory negligence upon the part of the plaintiff. G.S. 143-291 *et seq.*

Plaintiff has been damaged in the amount of $10,000.00 (corrected by Full Commission to $9,940.00) as a result of the negligent act committed by the defendant's employee. G.S. 143-291 *et seq.*"

Defendant appealed, assigning as error certain designated portions of the findings of fact and conclusions of law and the signing and entry of the order based thereon.

*Attorney General Thomas Wade Bruton by Staff Attorney Carlos W. Murray, Jr., for defendant appellant.*

*Lee, High, Taylor and Dansby by Alvis A. Lee for plaintiff appellee.*

MORRIS, J.

Defendant assigns as error the statement "Marable had no intention of hitting any individual" contained in finding of fact No. 10; all of finding of fact No. 14; and all of finding of fact No. 16. The conclusions of law are the subject of exceptions Nos. 9 and 11, on which assignment of error No. 4 is based, for that they are inapplicable and contrary to applicable law.

[1] Defendant candidly states in his brief that the sole conten-

tion on appeal is that the act of the security officer in firing his gun downward to disperse the crowd was intentional and not negligent; therefore, no recovery can be had under the Tort Claims Act. It is true, of course, that injuries intentionally inflicted by employees of agencies of the State are not compensable under the Tort Claims Act. *Jenkins v. Department of Motor Vehicles*, 244 N.C. 560, 94 S.E. 2d 577; *Givens v. Sellars*, 273 N.C. 44, 159 S.E. 2d 530.

Appellant relies on *Garratt v. Dailey*, (Supreme Court of Washington) 279 P. 2d 1091. There the plaintiff brought an action to recover for personal injuries suffered by her when defendant, a five-year-old boy moved a chair in which she had been sitting, and she fell. The plaintiff contended that, as she started to sit down in a wood and canvas lawn chair, the boy deliberately pulled it out from under her. Plaintiff did not testify. The defendant's evidence was that sometime after plaintiff came in the yard, he moved the chair a few feet sideways and seated himself in it, at which time he discovered that plaintiff was about to sit down at the place where the lawn chair had formerly been; that he hurriedly got up and attempted to move the chair toward plaintiff to aid her in sitting down in the chair. Because of his size and lack of dexterity, he was unable to get the chair under plaintiff in time to prevent her falling to the ground. The trial court adopted the defendant's version and made findings of fact in accordance therewith and denied recovery. On appeal, the Supreme Court remanded for the trial court to make a specific finding as to whether at the time the child moved the chair he knew with substantial certainty whether the plaintiff would attempt to sit down where the chair had been. The Court said, "If the court finds that he had such knowledge the necessary intent will be established and the plaintiff will be entitled to recover, even though there was no purpose to injure or embarrass the plaintiff."

The deputy commissioner found as a fact that "Officer Marable knew that a large crowd of people was near the west entrance door of the gym and that there were concrete sidewalks in the area and that the firing of his gun into the ground would likely cause injury to someone in the crowd and in so doing committed a negligent act." Defendant concedes that Officer Marable was negligent and earnestly contends that the facts found compel the conclusion that the act of Officer Marable was so wanton in character as to be an intentional tort precluding recovery by the plaintiff under the terms of the Tort Claims Act.

In *Jenkins v. Department of Motor Vehicles, supra,* the Supreme Court had before it the question of whether recovery under the Tort

Claims Act for the negligent act of a State employee is authorized where the negligent act complained of was the intentional shooting of a prisoner by a member of the State Highway Patrol who had him in custody. Justice Higgins, writing for the Court, said: "An analysis of our decisions impels the conclusion that this Court, in reference to gross negligence, has used the ᵥ term in the sense of wanton conduct. *Negligence, a failure to use due care, be it slight or extreme, connotes inadvertence.* Wantonness, on the other hand, connotes intentional wrongdoing." (Citations omitted.)

A thorough and exhaustive discussion of the degree of negligence sufficient to constitute an intentional tort depriving the defendant of the defense of contributory negligence appears in *Wagoner v. R. R.*, 238 N.C. 162, 77 S.E. 2d 701. A portion of the opinion of Parker, J. (now C.J.), is here quoted:

> " 'An act is wanton when, being needless, it manifests no rightful purpose, but a reckless indifference to the interests of others; and it may be culpable without being criminal.' *Wise v. Hollowell*, 205 N.C. 286, 171 S.E. 82. 'An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.' *Foster v. Hyman*, 197 N.C. 189, 148 S.E. 36.

> 'The term "wanton negligence" . . . always implies something more than a negligent act. This Court has said that the word "wanton" implies turpitude, and that the act is committed or omitted of willful, wicked purpose; that the term "willfully" implies that the act is done knowingly and of stubborn purpose, but not of malice . . . Judge Thompson says: "The true conception of willful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract or which is imposed on the person by operation of law. Willful or intentional negligence is something distinct from mere carelessness and inattention, however gross. We still have two kinds of negligence, the one consisting of carelessness and inattention whereby another is injured in his person or property, and the other consisting of a willful and intentional failure or neglect to perform a duty assumed by contract or imposed by operation of law for the promotion of the safety of the person or property of another." Thompson on Neg. (2d Ed.), Sec. 20, *et seq.' Bailey v. R. R.*, 149 N.C. 169, 62 S.E. 912.

> To constitute willful injury there must be actual knowledge, or that which the law deems to be the equivalent of actual knowl-

edge, of the peril to be apprehended, coupled with a design, purpose, and intent to do wrong and inflict injury. A wanton act is one which is performed intentionally with a reckless indifference to injurious consequences probable to result therefrom. Ordinary negligence has as its basis that a person charged with negligent conduct should have known the probable consequences of his act. Wanton and willful negligence rests on the assumption that he knew the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results. *Everett v. Receivers*, 121 N.C. 519, 27 S.E. 991; *Ballew v. R. R.*, 186 N.C. 704, 120 S.E. 334, *Foster v. Hyman, supra; S. v. Stansell*, 203 N.C. 69, 164 S.E. 580; 38 Am. Jur., Negligence, Sec. 48."

[2]     The evidence was that plaintiff's ward, along with others, went to Moore Gymnasium on the campus of A & T State University for the purpose of attending a dance which began at 2:30 a.m. and, although a part of the Homecoming activities, was open to the public. None of the persons in the minor plaintiff's group was an alumnus of or a student at the University. The ticket office was at the front of the building. The minor plaintiff and his friends got in line to purchase a ticket. The line was long and they could not immediately get to the ticket office, so they went around to the west side of the building where a group of about 75 to 100 people had gathered at the side door. One of the plaintiff's companions joined the group in trying to break open the door and illegally gain admittance. The minor plaintiff testified he stood around awhile and returned to the front door to see a friend, then started back to the west side of the building and was shot when he was rejoining the crowd. Plaintiff testified that if his friends had been successful in breaking in the door, he would have gone into the dance that way. Mr. Marable, the security officer, testified that he had been on duty continuously for over 16 hours. He was assigned to the front door of the gymnasium for the dance and was asked to go to the west door because "they're trying to break in". When he got there, the door had been opened and the crowd was pushing in. Two other men were preventing them from rushing in. There were some 12 or 14 trying to get in of a crowd of about 75 to 100 people outside the doors. He ran up and hit into the crowd with his shoulders, told them not to mess with the doors and pulled the doors together and wrapped a chain around them. Shortly thereafter, he again heard the crowd at the door but they stopped when they saw him. The third time he heard the crowd attempting to break in he returned to the doors, opened them and stepped out. There were "more than a hundred or 150 people and they was up against the doors." The people who were messing with the

doors moved but the people standing there did not move. He fired his pistol downward to the ground. In answer to whether he considered that he might injure someone at that time he replied "Things happened so fast, sir, I didn't have the time, you see, you didn't have the time." He said no one moved toward him but he was afraid for his safety because the crowd looked violent. Mr. Marable further stated that it was just as dangerous to fire either way, up or down; that there were buildings adjacent a parking lot by the gymnasium, but in his judgment the only way he could disperse the crowd was by firing his pistol. He fired two shots downward. He stated that the "first shot went off intentionally" but gave no explanation as to the second shot. The record does not disclose which shot hit the minor plaintiff who was shot in the chest slightly to the left and above the heart.

[3, 4]   In a jury trial, the court declares and explains the law arising on the evidence in the case. Guided by these instructions, the jury resolves the disputed facts and, by its verdict, declares the ultimate finding. In proceedings before the Industrial Commission, the Commission makes both findings of fact and conclusions of law. *Lowe v. Department of Motor Vehicles*, 244 N.C. 353, 93 S.E. 2d 448.

[2]   We cannot say that the evidence here compels no other conclusion than that Officer Marable's act was so grossly and wantonly negligent as to constitute an intentional tort.

[5-7]   Conceding, *arguendo*, that there was sufficient competent evidence to support the Commission's findings of fact with respect to the negligence of Officer Marable and that the findings of fact, in this respect, support the conclusions of law, we think the order entered by the Industrial Commission must be reversed because the findings of fact do not support the conclusion of law that the plaintiff was not contributorily negligent. An exception to the signing of an order presents for review the question whether the facts found support the conclusions of law. *Schloss v. Jamison*, 258 N.C. 271, 128 S.E. 2d 590. An appeal alone, or an exception to the judgment, does not present for review the findings of fact or the sufficiency of the evidence to support them. *Sternberger v. Tannenbaum*, 273 N.C. 658, 161 S.E. 2d 116; *Re Adams' Will*, 268 N.C. 565, 151 S.E. 2d 59; *Lewis v. Parker*, 268 N.C. 436, 150 S.E. 2d 729; *Hatchell v. Cooper*, 266 N.C. 345, 146 S.E. 2d 62. However, the determination of negligence, proximate cause, and contributory negligence are mixed questions of law and fact and are reviewable on appeal from the Commission, and the designation "Finding of Fact" or "Conclusion of

Law" by the Commission is not conclusive. *Brown v. Board of Education*, 269 N.C. 667, 153 S.E. 2d 335.

[8, 9]    Following these principles we look to see if the conclusions of law are supported by the findings of fact. Finding of fact No. 15 states, as do the conclusions of law, that while the claimant was in the crowd near the side of the gym, there was no contributory negligence on his part.

The findings of fact show that the plaintiff and one Braswell went to the Moore Gymnasium at approximately 2:00 a.m. on 14 October 1967 for the purpose of attending a public dance. Plaintiff and his companions waited in the ticket line for approximately 15 minutes and then went to the west side of the gymnasium where a door was located. There, they observed 75 to 100 people standing near the side entrance. These people were acting in an unruly manner and some had been drinking. Part of them were rattling and shaking the doors, and, in fact, some of the plaintiff's companions joined in these actions. There were no tickets to be sold at this side door. Marable, the security officer, came to the door and warned the crowd to go away. Plaintiff and his friends returned to the front of the building, and again stood in the ticket line for several minutes. Not being able to obtain a ticket during this time, they returned to west side of the building and again discovered that there were 75 to 100 people gathered at the side doors. Part of the crowd including plaintiff's companions, but not the plaintiff, began shaking the doors. Again, the security officer came to the door and instructed the crowd to stop shaking the door. Plaintiff, at this point, went around to the front of the building to see a friend. At this time the crowd began shaking the side doors for the third time. Plaintiff left the front of the building and was rejoining the crowd when the security officer shot his gun at the ground to disperse the crowd, and plaintiff was hit. Plaintiff did not participate in physically shaking the doors in an attempt to gain illegal entrance to the building; however, it is clear that all of the 75 to 100 people gathered outside the door could not participate in physically shaking and breaking in the doors. This illegal function had to be left to the few who were in position to reach the doors. Nevertheless the crowd, including the plaintiff, was obviously present for the purpose of gaining illegal entry when the doors were broken open; and it is clear that their presence gave aid, comfort and encouragement to the few who were in position actually to perform the illegal shaking and breaking. It seems to us that it was reasonably foreseeable that the security officer would undertake to perform his duty to prevent an illegal breaking and

entry of the building, and that someone in the crowd was likely to be injured in the process. It also seems that a reasonably prudent person, in the exercise of due care for his own safety, would not participate in mob action which was clearly intended to be in violation of the law and contrary to reasonable conduct. Every person is charged with the duty of exercising reasonable care for his own safety, and the joining in illegal mob action is not an exercise of reasonable care; in so doing plaintiff assumed the risk of whatever injury he might receive as a result. In addition, the illegal conduct of the mob of which the plaintiff was voluntarily a part was such as would reasonably be calculated to provoke the security officer into taking some action to disperse the mob.

We think the facts, as found by the Commission, give rise to one inference only, and that is — that the plaintiff was contributorily negligent in joining and rejoining the crowd. He knew they were acting in an unruly and unlawful manner and that the officer had warned them to stop trying to break in the doors. With this knowledge, he voluntarily became a member of the crowd on two occasions, and was rejoining the crowd a third time when he was shot. We think these facts point to only one conclusion; that is, the plaintiff was contributorily negligent as a matter of law. There being no findings of fact to support any other conclusion, the order of the Commission must be reversed. *Brown v. Board of Education, supra.*

Reversed.

CAMPBELL and BROCK, JJ., concur.