SHERI ELIZABETH PANGBURN v. DR. M. SAAD AND DR. E. V. MAYNARD

No. 844SC266

(Filed 5 March 1985)

1. **Physicians, Surgeons and Allied Professions § 11— wrongful release of mental patient—not based on malpractice—physician-patient privity not required**

An action for injuries suffered by a third party resulting from the wrongful release of a mental patient is not a medical malpractice case, and physician-patient privity is not required.

2. **Constitutional Law § 20— immunity of staff members at state hospital—no equal protection violation**

G.S. 122-24 (1981), which provides personal immunity for staff members of state hospitals, does not violate the equal protection clause of Art. I, Sec. 19 of the North Carolina Constitution because no suspect class or fundamental right is involved, and because a rational basis is served in that psychiatrists are exposed to unique risks when they decide to release a patient and, absent immunity, would be reluctant to accept lower-paying state jobs and disinclined to release patients.

3. **Insane Persons § 11; Courts § 1— personal immunity of state hospital staff members—limited to ordinary negligence—no violation of open courts**

G.S. 122-24, which grants personal immunity to staff members at state hospitals, does not leave the injured plaintiff without a remedy in violation of the open courts provision of Art. I, Sec. 18 of the North Carolina Constitution because it was intended to create a qualified immunity extending only to ordinary negligent acts, and does not protect a tort-feasor from personal liability for gross negligence and intentional torts. G.S. 97-10.1 (1979).

4. **Insane Persons § 11— wrongful discharge of mental patient—allegations sufficient**

Plaintiff's complaint stated a claim upon which relief could be granted and should not have been dismissed where she alleged that her brother had been under psychiatric care since childhood and had a history of emotional disorders and violent behavior which included attacks on family members, including plaintiff; that he had been committed to Cherry Hospital on at least seven occasions since 1979 and that defendant was aware of his psychiatric, mental and emotional history; that he was involuntarily committed to Cherry Hospital based on the recommendation of defendant, who had found him to be suicidal, dangerous to himself and others, and to have threatened harm to himself and others; that plaintiff's parents had met with defendant and objected to their son's release, telling defendant that they and their children were afraid to have him in the home; and that plaintiff was attacked and stabbed by her brother the same night he was released. G.S. 122-24 (1981).

Judge WELLS concurring.

APPEAL by plaintiff from *Bruce, Judge.* Judgment entered 1 December 1983 in Superior Court, ONSLOW County. Heard in the Court of Appeals 15 November 1984.

*Ellis, Hooper, Warlick, Waters & Morgan, by William J. Morgan, for plaintiff appellant.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by James D. Blount, Jr., and Jodee Sparkman King, for defendant appellee Saad.*

BECTON, Judge.

I

Plaintiff brought this action for compensatory and punitive damages for personal injuries suffered as a result of the wrongful release of her brother, Daniel Olin Pangburn, from Cherry Hospital in Goldsboro, North Carolina, by defendant, Dr. M. Saad, a staff psychiatrist at the hospital. Plaintiff alleges that her brother was discharged by defendant and sent home on 26 March 1982, and that less than 16 hours later, he stabbed her approximately 20 times with a kitchen knife, inflicting "serious, disfiguring and life-threatening wounds." Dr. Saad made a Rule 12(b)(6) motion to dismiss for failure to state a cause of action, which motion was granted by the trial court. Plaintiff appeals.

Plaintiff asks this Court to recognize a cause of action for injuries resulting from the wrongful release of a mental patient. She also asserts that N.C. Gen. Stat. Sec. 122-24 (1981), which allegedly confers immunity on Dr. Saad, as a State hospital medical staff member, for his decision to release Daniel Pangburn, is unconstitutional and thus presents no barrier to recognition of a cause of action. Defendant argues that plaintiff's action is barred because this is a medical malpractice action and there is no privity between plaintiff and Dr. Saad. Further, defendant contends that even if this Court recognizes a cause of action for wrongful release of a mental patient, G.S. Sec. 122-24 (1981) provides defendant with absolute immunity from personal liability.

We hold that plaintiff has stated a claim for relief against Dr. Saad, based on his wrongful release of her brother, and we further hold that G.S. Sec. 122-24 (1981) affords only a qualified immunity, immunizing physicians only from liability for their or-

dinary negligent acts but not from liability for their "wilful, wanton or recklessly" negligent acts or their intentional acts. As plaintiff has sufficiently alleged a cause of action against Dr. Saad for his decision to release Daniel Pangburn, the order of the trial court must be reversed.

## II

[1] The initial barrier posed by defendant Saad to recognition of plaintiff's cause of action is that there is no physician-patient privity between plaintiff and Dr. Saad. Defendant contends that such privity is an absolute prerequisite to a medical malpractice action. However, we are not faced with a medical malpractice action. The Supreme Court of Georgia rejected this exact argument on a wrongful death claim brought against the State: "[T]his is not a malpractice case; it is an ordinary negligence case in which privity has never been an essential element." *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 203, 296 S.E. 2d 693, 696-7 (1982). That court distinguished a negligent release situation from so-called "classic medical malpractice actions," noting that the legal duty involved with the former arose out of the general duty one owes to all the world not to subject it to an unreasonable risk of harm. The Georgia Court quoted with approval the lower court's definition of the legal duty involved in negligent release cases:

> '[W]here the course of treatment of a mental patient involves an exercise of "control" over [the patient] by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient.'

*Id.* at 201, 296 S.E. 2d at 695-6 (quoting *Bradley Center, Inc. v. Wessner*, 161 Ga. App. 576, 581, 287 S.E. 2d 716, 721 (1982)).

Addressing a factually comparable claim, the Fourth Circuit has said: "Apparently, no Virginia case deals with a claim similar to [plaintiff's], so we must resort to the general principles of the Virginia law of torts." *Semler v. Psychiatric Institute*, 538 F. 2d 121, 124 (4th Cir.), *cert. denied*, 429 U.S. 827, --- L.Ed. 2d ---, 97 S.Ct. 83 (1976). We likewise apply North Carolina tort principles, and find that plaintiff states a claim for actionable negligence,

namely, that defendant breached a duty that he owed to plaintiff, and that she was injured as a proximate cause of that breach, it being reasonably foreseeable that her injuries would result from the breach. *See Ashe v. Acme Builders, Inc.*, 267 N.C. 384, 148 S.E. 2d 244 (1966) (for elements of negligence); *Bradley Center, Inc. v. Wessner.*

### III

As we find that a cause of action exists, we must next examine the impact of G.S. Sec. 122-24 (1981), which provides:

> No administrator, chief of medical services, or any staff member under the supervision and direction of the administrator or chief of medical services of any State hospital shall be personally liable for any act or thing done under or in pursuance of any of the provisions of this Chapter.

Dr. Saad stated in his affidavit that he was a staff psychiatrist under the supervision and direction of the Administrator or Chief of Medical Services of Cherry Hospital. The release of Daniel Pangburn, an involuntarily committed patient, was apparently accomplished under G.S. Sec. 122-58.13 (1981). Clearly, then, the provisions of G.S. Sec. 122-24 (1981) seem to immunize defendant from liability, and the only reported cases found construing G.S. Sec. 122-24 (19  ) and its predecessor support this conclusion.

In *Bollinger v. Rader*, 151 N.C. 383, 66 S.E. 314 (1909), plaintiff sued the superintendent and directors of a state mental hospital for damages caused by the negligent release of a violent patient who murdered plaintiff's intestate six months after he was discharged. The Supreme Court, relying on the predecessor to G.S. Sec. 122-24, held that plaintiff had not stated a cause of action. In *Susan B. v. Planavsky*, 60 N.C. App. 77, 298 S.E. 2d 397 (1982), *disc. rev. denied*, 307 N.C. 702, 301 S.E. 2d 388 (1983), this Court held that money damages for personal liability could not be recovered in a suit brought against a staff doctor at a state mental hospital for infringement of the plaintiff-patient's right to seek a private mental health evaluation. Neither *Bollinger* nor *Susan B.* contains a constitutional challenge to the statute.

IV

A.

[2]   We next address plaintiff's constitutional challenge. Plaintiff attacks the constitutionality of G.S. Sec. 122-24 (1981) on two separate grounds: (a) that it violates the equal protection clause of Art. I, Sec. 19 of the North Carolina Constitution, and (b) that it violates the "open courts" provision found in Art. I, Sec. 18 of the North Carolina Constitution.

The statute does not violate our equal protection clause. The classification drawn in G.S. Sec. 122-24 (1981) distinguishes staff members of a State mental hospital from staff members of non-included hospitals, or possibly from all other State employees. As no suspect class or fundamental right is involved, the lower tier of equal protection analysis, the "rational basis" test, is employed. This test requires that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate government interest. *Abbott v. Town of Highlands*, 52 N.C. App. 69, 277 S.E. 2d 820, *appeal dismissed and disc. rev. denied*, 303 N.C. 710, 283 S.E. 2d 136 (1981); *see Lamb v. Wedgewood South Corp.*, 308 N.C. 419, 302 S.E. 2d 868 (1983) (legislative classifications presumed valid). Although no North Carolina case discusses the policy considerations undergirding the statute, it is self-evident that psychiatrists are exposed to unique risks when they decide to release a patient. Also, absent immunity, psychiatrists would be more reluctant to accept lower-paying state jobs, and disinclined to release patients once they accepted such jobs. In our opinion, these considerations easily justify the statutory classification.

B.

[3]   Article I, Sec. 18 of our Constitution provides, *inter alia*, that "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law. . . ." Plaintiff argues that if she is barred from bringing suit against Dr. Saad, she is denied a remedy for her injury. What plaintiff ignores, and what was emphasized in the *Lamb* Court's discussion of Art. I, Sec. 18, is the prerequisite of legislative recognition of a particular cause of action:

[T]he remedy constitutionally guaranteed must be one that is legally cognizable. The legislature has the power to define the circumstances under which a remedy is legally cognizable and those under which it is not.

308 N.C. at 444, 302 S.E. 2d at 882. The Supreme Court further noted that " '[s]o long as an act is not forbidden, the wisdom of the enactment is exclusively a legislative judgment.' " *Id.* at 433, 302 S.E. 2d at 876 (quoting *Mitchell v. Industrial Dev. Financing Auth.*, 273 N.C. 137, 144, 159 S.E. 2d 745, 750 (1968)).

*Lamb*, then, ostensibly supports the constitutionality of G.S. Sec. 122-24 under Art. I, Sec. 18. However, there is language in *Lamb* which questions its constitutionality:

We refrain from holding, as our Court of Appeals did [in the *Lamb* decision] and as other courts have done, that the legislature may constitutionally abolish altogether a common law cause of action. Neither do we mean to say that it cannot. The question is not before us.

308 N.C. at 444, 302 S.E. 2d at 882.

*Lamb* is not the first occasion on which the Supreme Court has declined to consider the constitutional question. In *Bolick v. American Barmag Corp.*, 54 N.C. App. 589, 284 S.E. 2d 188 (1981), this Court confronted the constitutional issue by stating: "G.S. Sec. 1-50(6), because it would absolutely abolish rights to seek redress for injuries, on its face violates article I, section 18." 54 N.C. App. at 593, 284 S.E. 2d at 191. On review, the Supreme Court, however, declared that the plaintiff had no standing to raise the constitutional issue, and declined to address it on the merits. *Bolick v. American Barmag Corp.*, 306 N.C. 364, 293 S.E. 2d 415 (1982). Therefore, because the differing constructions of Art. I, Sec. 18 adopted by the Court of Appeals in *Lamb* and *Bolick* have not been reconciled by our Supreme Court, whether the General Assembly may abolish a common law cause of action altogether is still unresolved. *But see Osborn v. Leach*, 135 N.C. 628, 47 S.E. 811 (1904) (court indicated in dicta that a statute disallowing recovery of any damages in libel action would have violated "open courts" provision).

The plaintiff in this case alleges that she was injured by the negligent or intentional act of a state employee, a cause of action

cognizable at common law. *Wirth v. Bracey*, 258 N.C. 505, 128 S.E. 2d 810 (1963). However, it does not appear that plaintiff is in fact wholly without a remedy for her injury. *See Stewart v. Houk*, 127 Or. 589, 271 P. 998, *reh'g denied*, 127 Or. 597, 272 P. 893 (1928) (legislature may modify the remedy, the form of procedure, and attach conditions precedent to the exercise of the right). Both parties concede in their briefs that plaintiff has a remedy under the State Tort Claims Act, as codified at N.C. Gen. Stat. Sec. 143-291 *et seq.* (1983). The Tort Claims Act permits a cause of action against the State for injuries arising out of the negligent acts of a State employee, while the employee was acting within the scope of employment. G.S. Sec. 143-291 (1983). Recovery for a claim brought under the Act is limited to $100,000. *Id.* However, injuries *intentionally* inflicted by State employees are not compensable under the Act. *Davis v. State Highway Comm'n*, 271 N.C. 405, 156 S.E. 2d 685 (1967). Therefore, if defendant acted negligently, we agree that a claim lies under the Act.

If G.S. Sec. 122-24 (1981) confers absolute immunity on those it protects, it becomes obvious that an injured person can sue neither the State nor the individual physician when a physician acts maliciously, corruptly, or in bad faith in releasing a mental patient. We thus reach the question of whether the legislature intended to include intentional torts within the scope of the immunity provided by the statute. Since we find no discussion of the policy behind G.S. Sec. 122-24 codified in the statute, or embodied in case law, we look to analogous North Carolina authority and authority from other jurisdictions. Turning first to North Carolina authority, we find a compelling analogy in the judicial interpretation of the exclusive remedy provision of North Carolina's Workers' Compensation Act, as codified at N.C. Gen. Stat. Sec. 97-1 *et seq.* (1979). In *Andrews v. Peters*, 55 N.C. App. 124, 284 S.E. 2d 748 (1981), *disc. rev. denied*, 305 N.C. 395, 290 S.E. 2d 364 (1982), this Court held that although the exclusive remedy provision, G.S. Sec. 97-10.1, precluded bringing a common-law action against a negligent employee, the employee who intentionally inflicted an injury could be sued. The policy reasons are clearly stated:

> We . . . conclude that an intentional tort is not the type of 'industrial accident' to which our legislature intended to give a co-employee immunity. To hold otherwise is to remove responsibility from the co-employee for his intentional con-

duct. [Citation omitted.] Why should he be concerned about the consequences of his acts if the cost of any intentionally-inflicted injury will be absorbed by the industry?

*Andrews v. Peters*, 55 N.C. App. at 127, 284 S.E. 2d at 750. We emphasize that the statutory language construed by the *Andrews* Court is conceptually similar to that of G.S. Sec. 122-24 (1981) insofar as it purports to grant absolute immunity.

The holding in *Andrews* has recently been expanded. Despite authority to the contrary and the lack of an express statutory provision, our Supreme Court held that "the Workers' Compensation Act does not shield a co-employee from common law liability for willful, wanton and reckless negligence." *Pleasant v. Johnson*, 312 N.C. 710, 325 S.E. 2d 244 (1985). The Court reasoned that "[i]t would be a travesty of justice and logic to permit a worker to injure a co-employee through such conduct, and then compel the injured co-employee to accept moderate benefits under the Act." *Id.* at 12.

By its seeming grant of absolute immunity, G.S. Sec. 122-24 (1981) is unlike other North Carolina statutes of its genre. These other statutes generally grant a qualified, rather than an absolute, immunity, and thus do not extend the immunity to situations in which the otherwise protected person has acted in bad faith, unreasonably, or maliciously. *See, e.g.,* N.C. Gen. Stat. Sec. 166A-14 (1982) (Emergency Management Act; no liability for employee's actions "except in cases of willful misconduct, gross negligence or bad faith"); N.C. Gen. Stat. Sec. 90-48.8 (1981) (members of dental peer review committee not liable for actions if not malicious and reasonable belief action warranted); N.C. Gen. Stat. Sec. 7A-550 (1981) (persons reporting child abuse); N.C. Gen. Stat. Sec. 90-171.47 (Supp. 1983) (persons reporting misconduct of nurses). Even N.C. Gen. Stat. Sec. 122-58.8A (Supp. 1983) (effective 1 January 1984), a newly-enacted statute providing immunity to both public and private mental health facilities, and their staffs, for actions connected with outpatient commitment, only grants immunity when the facility, physicians and staff "follow accepted professional judgment, practice and standards in the management, supervision and treatment of the respondent."

Turning next to the law of other jurisdictions, we find that:

It is generally recognized that public officers and employees would be unduly hampered, deterred and intimidated in the discharge of their duties, if those who acted improperly, or even exceeded the authority given them, were not protected to some reasonable degree by being relieved from private liability. Accordingly, the rationale for official immunity is the promotion of fearless, vigorous, and effective administration of policies of government. The threat of suit could also deter competent people from taking office.

63A Am. Jur. 2d *Public Officers and Employees* Sec. 358 at 924-5 (1984), and cases therein cited. Although the modern trend has been to grant more and more immunity to public officials, *id.*, there has been a marked restriction on the circumstances in which *absolute* immunity is available. *See Davis v. Knud-Hansen Memorial Hospital*, 635 F. 2d 179 (3d Cir. 1980). While judges and legislators have historically enjoyed absolute immunity, 63A Am. Jur. 2d, *supra; see Jones v. Perrigan*, 459 F. 2d 81 (6th Cir. 1972), the same has not been true for state officials and employees. The rationale given is that courts must strike a balance between the need to free the particular state official or employee to perform his or her functions without the vexation of defending lawsuits arising from their performance, against the right of an aggrieved party to seek redress. 63A Am. Jur. 2d, *supra*.

These general policy considerations are particularly well-suited to actions against a state psychiatrist (or a state hospital) for the release of a patient. Significantly, the various policy reasons for immunity apply exclusively to ordinary negligence actions; they have no relevance to grossly negligent and intentional acts. In determining whether state mental hospitals may be held liable for the negligent release of patients, an Ohio Court discussed policy considerations which are also pertinent to the liability of the individual physician:

Both private and public hospitals are faced with the extremely difficult task of balancing the interests of a patient who would benefit from permanent or periodic release, the interest of society in treating mental illness and returning the patient to a normal, productive life, and the interests of society in keeping a dangerous, mentally ill person off the streets. The uncertainties inherent in analyzing and treating

the human mind, let alone the decision of when a person is 'cured' and no longer a danger, renders the decisions of skilled doctors highly discretionary and subject to rebuke only for the most flagrant, capricious, and arbitrary abuse.

*Leverett v. State*, 61 Ohio App. 2d 35, 40, 399 N.E. 2d 106, 110 (1978).

In *Bellavance v. State*, 390 So. 2d 422 (Fla. Dist. Ct. App. 1980), *reh'g denied*, 399 So. 2d 1145 (Fla. 1981), a Florida court reasoned that although the State's standards for releasing mental patients are discretionary and thus immune from review, the subsequent ministerial action of the release itself was not so protected. The Court made the following policy analysis:

> There is a vital public interest in securing the earliest possible release and subsequent return to society of a person afflicted with mental illness, and it may well be argued that to subject the State to liability for the negligent release of these people will have a chilling effect upon . . . [that goal]. However, this potential chilling effect is significantly mitigated by . . . Section 768.28(9):
>
>> 'No officer, employee, or agent of the state or its subdivisions shall be held personally liable in tort for a final judgment which has been rendered against him for any injuries or damages suffered as a result of any act, event, or omission of action in the scope of his employment or function, *unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.*'
>
> Clearly, it is only under a most exacting standard that State employees may be subjected to ultimate personal liability.
>
> We also doubt that the potential liability of the State itself will be a significant inhibitor to the exercise of professional judgment by the personnel involved. Indeed, some inhibiting effect may well be healthy, for it should not be forgotten that the State's employees serve the needs of society as a whole as well as the needs of individual persons. Further, we cannot envisage any remedy, other than a tort suit for damages, to which the [plaintiffs] can resort.

*Id.* at 424-5. *See also St. George v. State,* 283 A.D. 245, 127 N.Y.S. 2d 147, *aff'd,* 308 N.Y. 681, 124 N.E. 2d 320 (1954) (doctors not legally responsible in damages for honest error of professional judgment, otherwise the result would be reluctance to release and the unnecessary confinement of person who would benefit by the release); *McDowell v. County of Alameda,* 88 Cal. App. 3d 321, 151 Cal. Rptr. 779 (1979) (although California statute provides absolute immunity to State psychiatrists for decisions whether to discharge mental patient, California recognizes that these physicians have a duty to warn intended victim).

In both the *Bellavance* and *Leverett* cases, *supra,* the applicable statutes granted only a qualified immunity to the individual physicians. This appears consonant with the trend, noted above, limiting the extension of absolute immunity. *See* 42 Pa. Cons. Stat. Ann. Sec. 8522 (Purdon 1982) (abolishing sovereign immunity as a bar to an action arising out of a negligent act, including acts of "health care employees of Commonwealth agency medical facilities or institutions . . ."). The Ohio statute relied on in *Leverett,* and the court's commentary thereon, is instructive:

> Persons acting reasonably and in good faith, either upon actual knowledge or information thought by them to be reliable, who procedurally or physically assisted in the hospitalization or discharge of a person pursuant to this chapter, do not come within any criminal provisions, and are free from any liability to the person hospitalized or to any other person.

Ohio Rev. Code Ann. Sec. 5122.34 (Page 1977). The *Leverett* Court explained:

> [T]he General Assembly intended for doctors practicing in mental hospitals to be free from liability for the discharge of patients if such discharge is reasonable and in good faith. Conversely, such an expressed intention necessarily implies that doctors could be liable at some time, presumably when they act unreasonably or in bad faith.

61 Ohio App. 2d at 42, 399 N.E. 2d at 111.

Therefore, the case law from other jurisdictions is replete with justifications for extending a qualified immunity to state psychiatrists for the negligent release of a patient. Our research

has failed to disclose a single cogent reason for shielding the grossly negligent or intentional wrongdoer from the consequences of his or her acts. We reiterate that G.S. Sec. 122-24 (1981) is an anomaly among North Carolina statutes granting immunity, and further note that a judicial limitation has been placed on the facially absolute statutory immunity granted under the Workers' Compensation Act, G.S. Sec. 97-10.1 (1979), to achieve the perceived legislative intent under analogous circumstances. *See Andrews v. Peters.* We therefore conclude that G.S. Sec. 122-24 was intended to create a qualified immunity for those state employees it protects, extending only to their ordinary negligent acts. It does not, however, protect a tortfeasor from personal liability for gross negligence and intentional torts. G.S. Sec. 122-24 does not, then, abolish a cause of action and leave the injured plaintiff without her remedy, but only defines the circumstances in which relief will be available. The statute, as construed, is thus constitutional and does not violate the "open courts" provision of Art. I, Section 18.

V

[4]  In conclusion, if plaintiff has stated a claim against Dr. Saad for his grossly negligent or intentional acts, it will withstand dismissal, since it will fall outside the statutory protection of G.S. Sec. 122-24 (1981).

The pertinent allegations of the Complaint are as follows: Daniel Pangburn has been under psychiatric care since childhood and has a history of emotional disorders and violent behavior which has included attacks on family members, including the plaintiff. Daniel has been committed to Cherry Hospital on at least seven occasions since 1979, and defendant is aware of Daniel's psychiatric, mental and emotional history. On 25 February 1982, a petition was filed in Onslow County Superior Court for the involuntary commitment of Daniel Pangburn. He was examined by defendant, who found him to be suicidal, dangerous to himself and others, and to have threatened physical harm to his family and others. Based on the recommendation of Dr. Saad, on 3 March, 1982, Daniel Pangburn was involuntarily committed to Cherry Hospital for 90 days. On the morning of 26 March 1982, the parents of Daniel Pangburn met with defendant and objected to defendant's decision to release their son. The

Pangburns told Dr. Saad that they and their children were afraid to have Daniel in the home and that they wished to have him placed in a chronic care unit. Daniel Pangburn was released in the late morning of 26 March 1982, and that same night he attacked and stabbed his sister, the plaintiff.

A Complaint will not be dismissed unless it appears that plaintiff is not entitled to relief under any state of facts that could be presented in support of the claim. *Andreson v. Eastern Realty Co.*, 60 N.C. App. 418, 298 S.E. 2d 764 (1983). Taking, as we must, the allegations of the Complaint as true, *id.*, we are satisfied that plaintiff's Complaint sufficiently charges both "wilful, wanton or reckless" negligence and intentional wrongdoing. We note that the Complaint specifically alleges that "the conduct and behavior of defendants was not only negligent in that it failed to comply with the applicable standard of care but also grossly negligent and wanton . . . so as to subject these defendants to punitive damages." *See Pleasant v. Johnson; Braswell v. N.C. A & T Univ.*, 5 N.C. App. 1, 8, 168 S.E. 2d 24, 28 (1969) ("Wantonness . . . connotes intentional wrongdoing."). Therefore, the trial court's order dismissing the action for failure to state a claim upon which relief may be granted must be reversed, and the cause remanded for further proceedings.

Reversed and remanded.

Judges ARNOLD and WELLS concur.

Judge WELLS concurring.

I believe that this case should be decided under rules of law applying to public officers generally, it being my position that the immunity statute at issue in this case codifies those rules as applicable to physicians employed at state hospitals.

Public officers acting within the scope of their authority are not answerable for ordinary negligence, but may be held liable if they act maliciously or corruptly.

> A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. . . . 'An act is wanton when it is done of

wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.' . . .

*In re Grad v. Kaasa*, 312 N.C. 310, 321 S.E. 2d 888 (1984) (quoting *Givens v. Sellars*, 273 N.C. 44, 159 S.E. 2d 530 (1968) ).

In her complaint, plaintiff alleges facts and circumstances showing that plaintiff's family, including herself, were in great fear of harm from plaintiff's brother, who was in defendant's care; and that these fears were clearly and forcefully expressed to defendant, while the family was imploring defendant not to release Daniel Pangburn from Cherry Hospital.

Plaintiff alleges that defendant, though aware of Daniel's violent and dangerous propensities and aware of his family's fear of him, "persisted in releasing Daniel Olin Pangburn and thus exhibited gross negligence and wanton conduct." These allegations were sufficient to state a claim for relief against defendant, sufficient, at the pleadings level to overcome defendant's immunity.