**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1617

TAMMY LOU FONTENOT, as Administratrix of the Estate of
Darryl Wayne Turner,

Plaintiff - Appellee,

and

DEVOID TURNER,

Plaintiff,

v.

TASER INTERNATIONAL, INC.,

Defendant - Appellant.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte. Robert J. Conrad,
Jr., Chief District Judge. (3:10-cv-00125-RJC-DCK)

Argued: September 19, 2013        Decided: November 22, 2013

Before TRAXLER, Chief Judge, and MOTZ and KEENAN, Circuit
Judges.

Affirmed in part, vacated in part, and remanded by published
opinion. Judge Keenan wrote the majority opinion, in which
Judge Motz joined. Chief Judge Traxler wrote a dissenting
opinion.

**ARGUED:** Pamela B. Petersen, TASER INTERNATIONAL, INC., Scottsdale, Arizona, for Appellant. John Christopher Burton, LAW OFFICES OF JOHN BURTON, Pasadena, California, for Appellee. **ON BRIEF:** John R. Maley, BARNES & THORNBURG LLP, Indianapolis, Indiana; Scott D. MacLatchie, WOMBLE CARLYLE SANDRIDGE & RICE, Charlotte, North Carolina, for Appellant. Charles A. Everage, EVERAGE LAW FIRM, PLLC, Charlotte, North Carolina; Peter T. Cathcart, John F. Baker, MAGAÑA, CATHCART & McCARTHY, Los Angeles, California; Kenneth L. Harris, KEN HARRIS & ASSOCIATES, PA, Charlotte, North Carolina; Peter M. Williamson, WILLIAMSON LAW FIRM, Woodland Hills, California, for Appellee.

BARBARA MILANO KEENAN, Circuit Judge:

Darryl Wayne Turner, age seventeen, died from cardiac arrest after a confrontation with police in which he was struck in the chest by electrical current emitted from a device commonly known as a "taser," manufactured by TASER International, Inc. (TI). The police officer who discharged the taser aimed the device at Turner's chest based on training provided by the Charlotte Mecklenburg Police Department (CMPD or the department), which used instructional materials supplied by TI.

The particular taser employed in the incident, the Model X26 device (X26 taser), had been the subject of several academic studies. TI knew about these studies, in which researchers had concluded that the device posed a risk of ventricular fibrillation, a cause of cardiac arrest, especially when the electrical current from the taser was applied near the subject's heart. Nevertheless, TI failed to warn taser users to avoid deploying the taser's electrical current in proximity to the heart.

Tammy Lou Fontenot, Turner's mother and the administrator of his estate, initiated a product liability action against TI in a North Carolina state court. In the complaint, Fontenot alleged that TI negligently failed to warn users of the risk posed by the X26 taser and, in particular, to warn them to avoid

3

applying the taser's electrical current near a subject's heart. She further alleged that TI's negligence was the proximate cause of Turner's death. A jury found in Fontenot's favor, awarding her $10 million in compensatory damages, which amount the district court remitted to about $6.15 million before deducting certain offset amounts received by Fontenot, resulting in a final award of about $5.5 million.

In this appeal, TI raises several arguments, including that the district court erred in barring from the jury's consideration TI's defense that Turner was contributorily negligent by engaging in the dispute and in refusing to comply with the police officer's directives. TI also contends that the damages award, even as remitted, is not supported by the evidence. Upon our review, we hold that the district court did not err in entering judgment in favor of Fontenot on the liability aspect of the negligence claim in accordance with the jury's verdict. However, we also hold that the damages award is not supported by the evidence, and we remand the matter to the district court for a new trial limited to that issue. Accordingly, we affirm the district court's judgment in part, vacate it in part, and remand the matter for further proceedings with respect to damages.

Turner was an employee of a Food Lion supermarket located in Charlotte, North Carolina, where he had worked for about a year. On March 20, 2008, Turner was confronted by a Food Lion loss prevention investigator after Mary Blackert, one of Turner's supervisors, "reported" Turner for eating a convenience food item and drinking a bottle of water that he had obtained from the store. Turner admitted that he had consumed those items without paying for them, and he was allowed to return to work while his supervisors discussed the matter.

After eating lunch at his home, Turner returned to the supermarket dressed in a manner that did not comply with the store's employee dress code. Blackert told Turner to "clock out and to get himself together." Turner refused, using profanity addressed to Blackert.

Blackert contacted the store manager, who instructed Blackert to terminate Turner's employment for insubordination. When Blackert informed Turner that he was fired, Turner refused to leave the store and continued arguing with her. Thereafter, Blackert placed a telephone call to a 911 operator and requested police assistance in removing Turner from the supermarket. During the entire incident, Turner acted in an aggressive manner and argued loudly with Blackert and the store manager. Turner

also threw an umbrella and pushed a store display off a counter, but he did not make physical contact with anyone during the dispute.

CMPD Officer Jerry Dawson arrived at the Food Lion in response to Blackert's request for assistance. Upon entering the store, Officer Dawson heard yelling and cursing. He removed his X26 taser from its holster while approaching Turner, who continued to argue with his supervisors. Officer Dawson instructed Turner to "calm down," but Turner continued behaving in an aggressive manner. Officer Dawson aimed the taser's red "laser dot" at Turner's chest, the location where Officer Dawson had been trained to aim. When Turner stepped toward Officer Dawson, he deployed the taser on Turner.

The X26 taser, which is shaped like a pistol, discharges two darts, one above the other, from a cartridge attached to the front of the device when its trigger is pulled.[1] One dart struck Turner in the center of his chest, very close to his heart, and the other dart struck him near his ribcage. Because the taser is designed to incapacitate an individual by causing that person's muscles to "lock up," Officer Dawson expected Turner to

---

[1] Each of the taser's darts must make contact with the target in order to form an electric circuit that will deliver an electrical current designed to incapacitate the target. The taser automatically delivers a five-second electrical current when the trigger is pulled, and delivery of the current may be extended by holding or repeatedly pulling the trigger.

collapse, but Turner stayed on his feet and walked toward the store's exit while the taser's darts continued delivering an electrical current. Officer Dawson followed Turner as he walked with the taser's darts still attached to his body, instructing Turner to "get down." During this period, Officer Dawson held down the taser's trigger, causing the device to continue emitting an electrical current, until Turner eventually collapsed 37 seconds after the device initially was activated. Officer Dawson discharged his taser on Turner for an additional five seconds because Turner did not comply with commands to put his hands behind his back after he had fallen to the ground.

When firefighters and paramedics arrived at the supermarket, they observed that Turner was experiencing ventricular fibrillation and was unresponsive.[2] The rescue team performed CPR and defibrillation on Turner but, despite these efforts, Turner was pronounced dead after being taken to a hospital.[3]

---

[2] "Ventricular fibrillation is the most serious cardiac rhythm disturbance," and occurs when the "heart's electrical activity becomes disordered." American Heart Association, Ventricular Fibrillation (Sept. 5, 2012), http://www.heart.org/ HEARTORG/Conditions/Arrhythmia/AboutArrhythmia/Ventricular-Fibrillation_UCM_324063_Article.jsp. Ventricular fibrillation causes collapse and cardiac arrest. Id.

[3] The CMPD investigated the incident and found that Officer Dawson's "prolonged use of the [taser] was not" in accordance (Continued)

TI primarily markets and sells its conducted electrical weapons products, including the X26 taser, to law enforcement agencies. One such law-enforcement purchaser of the X26 taser was the CMPD, which purchased X26 tasers for use by all the officers in the department.

From the introduction of the X26 taser in 2003, through the events at issue in this case, TI instructed taser users that the electrical current emitted by the X26 taser had no effect on heart rhythm when tested on animals. Captain Michael Campagna, who administered the CMPD's taser training program, received training from TI that use of the taser could not cause fibrillation of the human heart or cardiac arrest. TI also provided Captain Campagna and other users an "instructor's note" stating that even when "[t]he X26 was applied across the chest with the two probes in a 'worst case' scenario (the points most likely to stimulate the heart) . . . the heart beat continues normally. . . . It is important to note that the heart rate does not change at all."

Captain Campagna used this information and other material provided by TI to train CMPD officers, including Officer Dawson,

---

with CMPD procedures. Officer Dawson was suspended from duty for five days and was required to undertake additional training.

on use of the X26 taser. Officer Dawson recalled that the training materials provided by TI stated that application of the X26 taser had no effect on a subject's heart rates.

TI also provided Captain Campagna other training materials, which instructed users of the X26 taser to aim for the "center of mass," and used visual depictions of the taser's darts being fired at the middle of a person's chest. Based on this information, Officer Dawson and other CMPD officers were trained to aim the taser at a suspect's chest. Officer Dawson testified that, therefore, he had no reason to think that the act of firing the X26 taser at Turner's chest was more dangerous than aiming the device elsewhere, or that using the device in that manner could cause significant cardiac injury or death.[4]

As relevant to this case, the primary warning that TI provided to users of the X26 taser was included as part of the "TASER International Training Bulletin 12.0-04," which TI issued in June 2005. In that document, TI cautioned that "[r]epeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may cause strong muscle contractions that <u>may impair</u>

---

[4] Although TI later revised its training materials and the X26 taser operating manual before Turner's death, those revised documents did not provide warnings concerning the risk of ventricular fibrillation or cardiac arrest when the taser is fired at a suspect's chest. In particular, the revised X26 training material also included a visual depiction of a police officer aiming the taser at the suspect's chest.

breathing and respiration, particularly when the probes are placed across the chest or diaphragm. Users should avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges whenever practicable. . . ." (Emphasis added.) Notably, this TI Training Bulletin, which the CMPD provided to its officers, discussed only the potential for respiratory harm, rather than the risk of severe cardiac problems, resulting from the use of the X26 taser.

Shortly after TI issued the June 2005 Training Bulletin, TI received the results of a TI-funded study conducted by Dr. Dhanunjaya Lakkireddy concerning additional testing of the X26 taser. This study, which was published in the Journal of the American College of Cardiology, showed that the taser's electrical pulses can "capture" cardiac rhythms, potentially leading to ventricular fibrillation. The study further noted that if users avoided striking the subject's chest area with the taser's darts, the risk of ventricular fibrillation would be reduced significantly.

TI received the results of another study in 2006, which was conducted by Dr. Kumaraswamy Nanthakumar and was published in the same medical journal. Dr. Nanthakumar's study likewise showed a risk of ventricular fibrillation in test animals when darts fired from the X26 taser lodged near the subject animal's chest. Notably, the study showed that when the darts struck the

10

animal in areas away from the chest, such as in the abdomen, the taser did not capture heart rhythms and, thus, using the taser in this manner avoided the risk of causing ventricular fibrillation.

These conclusions reached by Dr. Lakkireddy and Dr. Nanthakumar conflicted with TI's representations in its training materials that the X26 taser could not capture heart rhythms and was safe even when applied directly to a person's chest. Nevertheless, as confirmed by TI's chief executive officer and the company's vice president of training, TI did not alter its training materials to warn users of the X26 taser that shots to a person's chest could result in ventricular fibrillation, or that use of the taser near a person's heart should be avoided based on that risk. Accordingly, up until the time of Turner's death, Captain Campagna and Officer Dawson continued to think that electrical current emitted by the X26 taser, even when applied near a person's heart, did not affect heart rhythms or entail risks of cardiac arrest.

C.

Fontenot, as administrator of Turner's estate, filed a complaint against TI in a North Carolina Superior Court alleging negligence under North Carolina's product liability act, N.C. Gen. Stat. §§ 99B-1 through 99B-11 (the product liability act). As reflected in the complaint, Fontenot's primary theory was

11

that TI was negligent in failing to warn users of the X26 taser that the device could cause an adverse cardiac event, particularly when at least one of the taser's darts is positioned on a person's chest.[5]

TI removed the action to federal district court asserting diversity jurisdiction under 28 U.S.C. § 1332(a). In the district court, Fontenot filed a pretrial motion seeking to exclude from the jury's consideration TI's affirmative defense of contributory negligence. TI contended that Turner was contributorily negligent by failing to exercise ordinary care for his own safety in instigating the dispute at the supermarket, and in failing to comply with Officer Dawson's directions after the police arrived at the scene.

The district court granted Fontenot's motion and barred TI from submitting its contributory negligence defense to the jury. The court later explained that the statutory language at issue bars any recovery when the "[t]he claimant failed to exercise reasonable care under the circumstances in the use of the product." See N.C. Gen. Stat. 99B-4(3) (emphasis added). The district court also noted that the North Carolina product

---

[5] Fontenot also sought punitive damages on the basis that TI's conduct was malicious, willful, and wanton, but the district court granted summary judgment in TI's favor with respect to that aspect of her claim. Fontenot does not appeal from that ruling.

12

liability cases addressing contributory negligence all involved plaintiffs who actually had used the allegedly defective products, and that, in this case, Turner did not "use" the taser. Additionally, the court reasoned that:

> Finding contributory negligence in this circumstance would immunize [TI] from ever being liable for a product defect. Police officers do not deploy a taser unless a suspect has acted at least unreasonably. Therefore, a person who has been tased would always be barred by contributory negligence from suing [TI].

The case proceeded to a jury trial. After Fontenot presented her case, TI made a motion seeking judgment as a matter of law on several bases, including that the evidence established as a matter of law that Officer Dawson misused the taser. The district court denied the motion and the case was submitted to the jury, which returned a verdict in Fontenot's favor and awarded her $10 million in compensatory damages.

The jury specified on the verdict form that TI unreasonably failed to provide an adequate warning or instruction, thereby creating an unreasonably dangerous condition about which TI knew or should have known, and that such failure to provide an adequate warning or instruction proximately caused Turner's death. The jury further stated on the verdict form that, with respect to TI's product misuse defense, Officer Dawson did not use the taser in a manner contrary to TI's instructions, that TI's instructions and warnings were not adequate, and that

13

Turner's death was not caused by Officer Dawson's use of the taser contrary to TI's instructions or warnings.

After the trial, TI renewed its earlier motion for judgment as a matter of law and, in the alternative, sought a new trial under Rule 59 of the Federal Rules of Civil Procedure. The district court declined to disturb its previous ruling excluding TI's contributory negligence defense. The court further held that substantial evidence supported the jury's verdict on causation and the inadequacy of TI's warnings.

Addressing the $10 million damages award, the district court characterized the evidence of damages as "relatively thin," and the court ultimately concluded that the award was excessive. The court initially remitted the award to $7.5 million, further remitted the award to about $6,156,503.65 after adjusting it for present value, and reduced that amount to $5,491,503.65 after deducting $40,000 Fontenot received from a Food Lion workers' compensation award and $625,000 that she received from a settlement with the City of Charlotte.[6] After

---

[6] Although the district court instructed the jury to reduce to its present value the monetary value that Turner had to his parents over their expected lifetimes, the court nevertheless concluded that the size of the verdict suggested that the jury did not make that reduction. Therefore, the district court applied a one-percent discount value, as requested by Fontenot, which resulted in an award of $6,156,503.65. Neither party challenges on appeal the district court's present value determination.

14

Fontenot accepted the reduced amount of $5,491,503.65, the district court entered final judgment in that amount. TI timely filed a notice of appeal.

## II.

On appeal, TI raises four primary arguments, contending that the district court erred: (1) in barring TI's contributory negligence defense; (2) in refusing to award judgment in TI's favor when the evidence purportedly did not show that Officer Dawson would have used the taser differently had TI provided warnings about the risk of ventricular fibrillation; (3) in refusing to award judgment in TI's favor because Officer Dawson's use of the taser constituted product misuse; and (4) in entering judgment in an amount that was excessive and not supported by the evidence. We discuss these arguments in turn.

## A.

We first address TI's contention that the district court erred in barring TI's contributory negligence defense. TI asserts that under the plain language of the product liability statute, and under general principles of North Carolina law, a claimant in a product liability action need not have "used" the product in order for the doctrine of contributory negligence to apply. We disagree with TI's argument.

15

Initially, we observe that the question before us raises an issue of first impression under North Carolina law. Our Court has on occasion certified state law questions to the highest court of a state in similar circumstances, but we are unable to do so here because North Carolina currently has no mechanism by which we may certify such questions. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013). Accordingly, we must attempt to determine how the Supreme Court of North Carolina would decide the issue. See McNair v. Lend Lease Trucks, Inc., 95 F.3d 325, 328 (4th Cir. 1996). We consider whether contributory negligence may be raised as a defense under North Carolina law in a product liability action when the claimant has not "used" the product. This question presents an issue of law, which we review de novo. See Solis v. Malkani, 638 F.3d 269, 275 (4th Cir. 2011); United States v. Perrin, 45 F.3d 869, 871 (4th Cir. 1995).

In Section 99B-4 of the General Statutes of North Carolina, the legislature codified the common law doctrine of contributory negligence as it applies in product liability actions. See Nicholson v. Am. Safety Util. Corp., 488 S.E.2d 240, 243-44 (N.C. 1997). In relevant part, Section 99B-4(3) provides:

> No manufacturer or seller shall be held liable in any product liability action if: . . . (3) The claimant failed to exercise reasonable care under the circumstances in the use of the product, and such

16

failure was a proximate cause of the occurrence that caused the injury or damage complained of.

N.C. Gen. Stat. § 99B-4(3) (emphasis added).

We consider the plain words of Section 99B-4(3) in interpreting the statute. See Frye Reg'l Med. Ctr., Inc. v. Hunt, 510 S.E.2d 159, 163 (N.C. 1999). We are guided by the principle of statutory construction that a statute should be "construed, if possible, so that none of its provisions shall be rendered useless or redundant. It is presumed that the legislature intended each portion to be given full effect and did not intend any provision to be mere surplusage." Porsh Builders, Inc. v. City of Winston-Salem, 276 S.E.2d 443, 447 (N.C. 1981) (citation omitted); accord City of Concord v. Duke Power Co., 485 S.E.2d 278, 282 (N.C. 1997).

Applying these principles, we agree with Fontenot that Section 99B-4(3) requires that the claimant have "used" the product before the defense of contributory negligence can arise. The statute plainly provides that, in a product liability action, a manufacturer or seller may not be held liable if "[t]he claimant failed to exercise reasonable care under the circumstances in the use of the product."[7]  N.C. Gen. Stat. § 99B-4(3) (emphasis added).

---

[7] The term "claimant" is defined in the statute to include a decedent if the claim has been asserted on behalf of the decedent's estate. N.C. Gen. Stat. § 99B-1(1).

17

TI urges us to interpret the statute as merely requiring that a claimant failed to exercise reasonable care during an incident involving anyone's use of the product causing injury to the claimant, without regard to whether the claimant actually used the product at issue. That interpretation, however, would render superfluous or redundant the phrase "in the use of the product." Under TI's suggested construction, we would consider only whether "[t]he claimant failed to exercise reasonable care under the circumstances," thereby ignoring the additional words "in the use of the product" that the legislature included in Section 99B-4(3). We cannot reach such a result. See Porsh Builders, 276 S.E.2d at 447; cf. In re Hayes, 681 S.E.2d 395, 403 (N.C. Ct. App. 2009) (rejecting proffered interpretation of statutory provision that would render a term redundant). Instead, we conclude that the statute unambiguously bars recovery by a claimant in a product liability action on the ground of contributory negligence when the claimant has used the product in some manner and has failed to exercise reasonable care under the circumstances.[8]

We acknowledge that Section 99B-4(3) was amended by the North Carolina General Assembly, effective January 1, 1996,

---

[8] For this reason, we reject TI's argument concerning the significance of the legislature's use of the term "claimant" in Section 99B-4(3), rather than the term "user."

18

along with other more substantive changes to various sections of the product liability act.  See An Act of July 29, 1995, ch. 99B, 1995 N.C. Sess. Laws 522 (amending product liability act). In relevant part, the prior version of Section 99B-4(3) provided that contributory negligence operates to bar recovery in a product liability action if "the claimant failed to exercise reasonable care under the circumstances in his use of the product."  N.C. Gen. Stat. § 99B-4(3) (1995) (emphasis added).

TI correctly observes that an amendment to a statute indicates that the legislature "intended to add to or to change the existing enactment."  State v. Mabry, 720 S.E.2d 697, 701 (N.C. Ct. App. 2011).  However, TI cites no legislative history showing that this change in statutory language from "his" to "the" was anything other than the legislature's decision to make the language of that provision gender-neutral.  Moreover, under North Carolina law, a court interpreting a statute may rely on the statute's legislative history only in instances in which the statutory language is ambiguous.  See In re Vogler Realty, Inc., 722 S.E.2d 459, 462 (N.C. 2012).  Because we conclude that the language of Section 99B-4(3) is unambiguous, we do not further consider TI's argument concerning the legislative history of that provision.  See Diaz v. Div. of Soc. Servs., 628 S.E.2d 1,

19

3 (N.C. 2006) (judicial construction of legislative intent is not required when statutory language is clear).[9]

As the district court and the North Carolina Court of Appeals both have observed, every North Carolina product liability case addressing contributory negligence, whether under the current or former version of Section 99B-4(3), has involved a claimant's actual use of the allegedly defective product. See Fontenot v. Taser Int'l, Inc., 2012 WL 1379054, at *5 (W.D.N.C. Apr. 20, 2012) (citing Nicholson v. Am. Safety Util. Corp., 476 S.E.2d 672, 679–680 (N.C. Ct. App. 1996), aff'd on other grounds, 488 S.E.2d 240 (N.C. 1997)). The cases cited by TI do not undermine the import of this observation.[10]

---

[9] Our colleague in dissent relies principally on several North Carolina common law cases which, as discussed in this opinion, are readily distinguishable. In our view, however, any analysis of the issue whether Turner could be found contributorily negligent under Section 99B-4 should begin with the plain language of that statutory provision. As the Supreme Court of North Carolina has held, "[s]tatutory interpretation properly begins with an examination of the plain words of the statute." Ocean Hill Joint Venture v. N.C. Dep't of Env't, Health, & Natural Res., 426 S.E.2d 274, 277 (N.C. 1993) (citation omitted).

[10] The observation that North Carolina product liability cases applying contributory negligence have involved the claimant's use of the allegedly defective product is consistent with the discussion of contributory negligence in this context as stated by well-recognized treatises. See, e.g., Am. L. Prod. Liab. 3d § 40:9 (explaining that in the product liability context, "the plaintiff is required to act reasonably with respect to the product he or she is using" for purposes of contributory negligence) (emphasis added); Restatement (Second) (Continued)

20

In the two primary product liability cases on which TI relies, our decision in Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712 (4th Cir. 1995), and the Supreme Court of North Carolina's decision in Nicholson v. American Safety Utility Corp., 488 S.E.2d 240 (N.C. 1997), the respective claimants used the products at issue. In Jones, the claimants, workers in a factory in which products containing asbestos insulation were manufactured, sued the insulation's manufacturer after they developed asbestosis and lung cancer. Jones, 69 F.3d at 715-16. The defendant manufacturer asserted contributory negligence under Section 99B-4(3), arguing that the plaintiffs failed to exercise reasonable care "in their use of the asbestos-containing products" by continuing to smoke cigarettes, despite the hazards relating to smoking and asbestos exposure being "widely known." Id. at 719.

This Court held that contributory negligence could be applicable under the defendant's theory, but observed that the defendant's "only possibility of prevailing. . . require[d] proof that [the claimants] were given such a warning" about "the synergistic effect of cigarette smoking and asbestos exposure." Id. at 721. Thus, we stated in Jones that the "statutory focus"

---

of Torts § 388 cmt. f (noting that "[t]he person using the chattel may disable himself from bringing an action [] by his contributory negligence") (emphasis added).

of Section 99B-4(3) was not the claimants' use of the product "per se," but, instead, was whether the claimants failed to exercise reasonable care under the circumstances in their "use of the product." Id. at 721-22. Our holding in Jones therefore cannot be read as more than a statement that contributory negligence may bar a claimant's recovery in a product liability action in North Carolina if the evidence shows that the defendant warned the claimant of the injury that may result from the claimant's use of a product. We neither held nor implied in Jones that a contributory negligence defense could be asserted in cases in which the claimant did not use the product in any manner.

In the present case, the record is devoid of any evidence that Turner knew or should have known that police deployment of the taser could cause him to suffer severe cardiac injury. Indeed, the record is undisputed that neither Officer Dawson nor any other members of the CMPD knew that such injury could be caused by use of the taser near a subject's heart. Thus, this crucial factual distinction between the present case and the circumstances discussed in Jones renders inapposite the ultimate result we reached there.

In Nicholson, an electrical lineman was injured when an energized power line came in contact with his head after his helmet was "blown off." 488 S.E.2d at 241-42. That contact

22

resulted in electricity surging through his body and exiting through his hand, on which he was wearing a rubber safety glove manufactured and sold by the defendants. Id. at 242. In the product liability action filed by Nicholson, the defendants asserted a contributory negligence defense, arguing that Nicholson failed to keep his helmet properly secured and continued working after it fell off. 476 S.E.2d at 679. After the trial court granted summary judgment to the defendants, the North Carolina Court of Appeals reversed, concluding that any negligence on Nicholson's part must relate to his use of the gloves, and that the evidence did not establish that Nicholson was negligent in such use. Id. at 679-80.

On appeal, the Supreme Court of North Carolina agreed that summary judgment in favor of the claimant on the contributory negligence defense was not appropriate, holding that issues of fact needed to be resolved. 488 S.E.2d at 245. Departing from the rationale adopted by the court of appeals, the court explained that a claimant's negligent behavior need not be confined to the claimant's use of the product itself for contributory negligence to lie, but that "all of the circumstances during the plaintiff's use of the product must be considered, not just plaintiff's conduct with respect to the product itself." Id. at 244 (emphasis added). Thus, the decision in Nicholson, like the decision in Jones, did not hold

23

that contributory negligence may apply even in cases in which the defendant did not make any use of the product at issue.

Instead, the holdings in Jones and Nicholson stand for the unremarkable proposition, not at issue in this case, that so long as the claimant was using the product during the events that led to the injury, the claimant's negligence need not arise solely with respect to use of that product for a contributory negligence defense to be available. We further note that in two other product liability cases cited by the parties involving a contributory negligence defense, decided after Section 99B-4(3) was amended, the claimants "used" the product at issue. See Muteff v. Invacare Corp., 721 S.E.2d 379 (N.C. Ct. App. 2012) (electric wheelchair manufacturer asserted contributory negligence defense after decedent's wheelchair caught fire when charging overnight while her metal necklace was in contact with the live blades of the wheelchair's charger cord); Lashlee v. White Consol. Indus., Inc., 548 S.E.2d 821 (N.C. Ct. App. 2001) (chainsaw manufacturer asserted contributory negligence defense based on plaintiff's operation of the chainsaw while standing on a ladder without being secured to the tree).

TI nevertheless asserts that its position is supported by various North Carolina court decisions outside the product liability context that cite principles applicable to negligence

claims generally. However, the three North Carolina Court of Appeals cases on which TI relies are inapposite.

TI first cites <u>Hinton v. City of Raleigh</u>, in which a robbery suspect was shot and killed by police officers following the robbery. 264 S.E.2d 777, 778 (N.C. Ct. App. 1980). The suspect's mother brought an action against the City of Raleigh and other defendants alleging a variety of claims, including negligent supervision and training. <u>Id.</u> The court of appeals affirmed the award of summary judgment in favor of the defendants, noting that the evidence established that the decedent participated in an armed robbery in which a gun was used, and that he "went into a crouching position and pointed toward the officers" when he was ordered to halt. <u>Id.</u> at 779. In explaining its decision, the court observed, among other things, that the decedent's own actions contributed to the killing. <u>Id.</u>

Here, in contrast, the evidence showed that Turner's actions did not proximately contribute to his killing, which was caused by the application of electrical force to his chest rather than to other parts of his body. Nothing that Turner did caused Officer Dawson to aim the taser at Turner's chest, rather than at another area of his body. Thus, the decision in <u>Hinton</u> fails to support TI's position.

TI next relies on Braswell v. N.C. A&T State University, which involved a claimant who was injured when a security officer fired his pistol into the ground to disperse a crowd seeking to break into a college gymnasium. 168 S.E.2d 24, 29 (N.C. Ct. App. 1969). The court of appeals held that the plaintiff was contributorily negligent because he joined the crowd despite knowing that the members of the crowd were "acting in an unruly and unlawful manner and that the officer had warned them to stop trying to break in the doors." Id. at 31. Notably, the court stated that by joining the unruly crowd, "plaintiff assumed the risk of whatever injury he might receive as a result."[11] Id. (emphasis added). Accordingly, Braswell is inapposite because the "assumption of risk" doctrine on which the Braswell court focused has not been raised by TI, and, indeed, has no application in a case involving a theory of negligent failure to warn a product user of risks associated with use of a product.

Finally, TI relies on Benton v. Hillcrest Foods, Inc., a case in which the claimants were shot in a restaurant by other patrons during a confrontation, but were barred from recovering damages from the restaurant's owner on the ground of

---

[11] The assumption of risk doctrine is distinct from the contributory negligence doctrine under North Carolina law. See Sasser v. Hales Bryant Lumber Co., 81 S.E. 320, 321 (N.C. 1914).

26

contributory negligence. 524 S.E.2d 53, 58 (N.C. Ct. App. 1999). The facts in Benton included the claimants' acts of intentional provocation toward the shooters, and the claimants' refusal to leave the restaurant through an available back door despite their knowledge that the shooters had left temporarily to obtain loaded guns from their car. Id. Thus, the facts in Benton are starkly different from those before us, rendering its holding inapposite to the present case.

We again note the absence of any North Carolina cases finding contributory negligence in a product liability action in which the claimant did not use the product at issue. This absence of analogous North Carolina case law is significant because, in construing the common law of a state, we have declined to expand state common law principles to encompass novel circumstances when the courts of that state have not done so first. See Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314-15 (4th Cir. 2007) ("Time Warner has proffered no cases interpreting North Carolina law to extend the common law prohibition . . . and we have found none. . . . We conclude accordingly that as a court sitting in diversity, we should not create or extend the North Carolina common law."); Burris Chem., Inc. v. USX Corp., 10 F.3d 243, 247 (4th Cir. 1993) (federal courts adjudicating issues of state law "rule upon state law as

27

it exists and do not surmise or suggest its expansion"). In our view, it would be an expansion of North Carolina law if we permitted a contributory negligence defense here, when such a defense is not supported by the plain language of Section 99B-4(3), and when there are no analogous North Carolina cases supporting the availability of that defense under the novel circumstances presented.

Finally, we observe that application of the contributory negligence doctrine under the present circumstances would absolve TI of its responsibility to provide adequate warnings to persons using TI's tasers, and effectively would grant TI immunity from suit in North Carolina negligence actions that are based on police use of a taser on a suspect resisting arrest. At its core, TI's position is that contributory negligence should be applied as a blanket proposition to bar recovery for all incidents in which a person is involved in a dispute, does not surrender to authorities, and is subdued or killed by a police officer's use of a taser. Such a situation, however, will be present in nearly every instance in which a taser is deployed by a law enforcement officer. Moreover, such circumstances are the very reason why law enforcement agencies use products like the X26 taser.

Accepting TI's argument would have additional significant consequences, as TI essentially would have no duty in North

Carolina to safely design its products or to provide adequate warnings to law enforcement customers such as the CMPD. We do not think that the Supreme Court of North Carolina would create such an extreme result based on the facts presented here. For these reasons, we hold that the district court did not err in precluding TI from asserting contributory negligence as an affirmative defense.

B.

We next consider TI's argument that the district court erred in failing to direct a verdict in TI's favor because the evidence purportedly failed to establish that an appropriate warning about the dangers of the X26 taser would have caused Officer Dawson to use the taser in a different manner. We disagree with TI's argument.

We review de novo the district court's denial of a Rule 50 motion for judgment as a matter of law, considering the evidence in the light most favorable to Fontenot as the nonmoving party. See Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489-90 (4th Cir. 2005). If a verdict in favor of the nonmoving party "would necessarily be based upon speculation and conjecture," judgment as a matter of law must be entered in the moving party's favor. Id. at 489. However, "[i]f the evidence as a whole is susceptible of more than one reasonable inference, a

29

jury issue is created and a motion for judgment as a matter of law should be denied." Id. at 489-90.

Under North Carolina law, a claimant bringing a product liability action under a failure to warn theory must establish that the defendant's failure to provide an adequate warning or instruction was "a proximate cause of the harm." N.C. Gen. Stat. § 99B-5(a). After reviewing the present record, we hold that there is sufficient evidence from which the jury could have concluded that Officer Dawson would have used the X26 taser in a different manner had TI provided an adequate warning concerning the dangers of firing the taser to make contact near a person's heart. Officer Dawson testified that he read Taser's training materials, which stated that when the X26 taser was tested the device was found to have had no effect on heart rhythms. Officer Dawson stated that he received such information concerning the taser's safety during a "refresher" training course as recently as a month before the incident occurred. He also testified about instructions that he received from CMPD trainers, who used TI's training materials, to aim the taser at a suspect's chest.[12] In sum, the gravamen of Officer Dawson's

---

[12] Officer Dawson's receipt and understanding of the information provided by TI distinguishes this case from Edwards v. ATRO SpA, 891 F. Supp. 1074 (E.D.N.C. 1995), on which TI relies. In Edwards, the court held that the plaintiff could not prevail on a failure-to-warn theory against a manufacturer of a (Continued)

testimony was that he deployed the taser on Turner based on the information provided by TI that the X26 taser was safe to use, could not cause cardiac arrest, and did not present an elevated risk of injury when the device's darts were positioned near a person's heart.

Additionally, Captain Campagna, who administered the CMPD's taser program, testified that until Turner's death, officers were instructed that TI's testing showed that the X26 taser did not affect heart rhythms, even when applied to a suspect's chest. Captain Campagna further testified that he "absolutely" would have wanted to know if testing showed a risk that application of the X26 taser to the chest of a suspect could affect the suspect's heart rhythms.

Given that Captain Campagna had issued a memorandum to CMPD officers relaying the additional safety information provided by TI in its June 2005 Training Bulletin, the jury reasonably may have inferred that Captain Campagna would have informed Officer Dawson and other CMPD officers of warnings concerning a risk of serious cardiac injury from use of TI's tasers near a person's heart. Further, the jury reasonably may have inferred that such information would have affected Officer Dawson's understanding

---

nail gun that had been discharged accidentally, because neither the plaintiff nor his co-worker had read or obtained the owner's manual for the nail gun. See id. at 1078.

31

of the risks involved in use of the taser, and would have caused Officer Dawson to aim the taser at a different location on Turner's body. Therefore, we conclude that the evidence supports the jury's finding that TI's failure to provide an adequate warning was a proximate cause of Turner's death.

For these reasons, we reject TI's argument that Fontenot did not establish a causal link between TI's failure to issue warnings concerning the risk of cardiac arrest and Officer Dawson's use of the taser on Turner's chest. Accordingly, we hold that the district court did not err in denying this aspect of TI's motion for judgment as a matter of law.

C.

TI also argues that the district court erred in failing to award judgment in TI's favor on the basis of product misuse. TI contends that, as a matter of law, Officer Dawson misused the X26 device by employing it on Turner for 37 continuous seconds, and that such misuse was contrary to the instructions and warnings provided by TI. We disagree with TI's argument.

We review de novo the district court's denial of TI's motion for judgment as a matter of law on the issue of product misuse. See Myrick, 395 F.3d at 489. Judgment as a matter of law should not be entered unless the court concludes, after reviewing the entire record and considering it in the nonmoving party's favor, that "the evidence presented supports only one

reasonable verdict, in favor of the moving party." Dotson v. Pfizer, 558 F.3d 284, 292 (4th Cir. 2009) (citation omitted).

North Carolina General Statutes Section 99B-4(1) provides, in relevant part, that "[n]o manufacturer or seller shall be held liable in any product liability action if: (1) The use of the product giving rise to the product liability action was contrary to any express and adequate instructions or warnings delivered with, appearing on, or attached to the product . . . ." (Emphasis added.) See Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 148 (4th Cir. 2001) (under N.C. Gen. Stat. § 99B-4(1), failure to follow "express and adequate instructions" precludes recovery in product liability action). TI asserts that its warnings, including the June 2005 Training Bulletin, adequately informed users that the taser should not be employed for an extended duration. TI's warning on this point in the Bulletin stated as follows:

> Repeated, prolonged, and/or continuous exposure(s) to the TASER electrical discharge may cause strong muscle contractions that may impair breathing and respiration, particularly when the probes are placed across the chest or diaphragm. Users should avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges whenever practicable in order to minimize the potential for over-exertion of the subject or potential impairment of full ability to breathe over a protracted time period.

(Emphasis added.)

33

Our review of this warning, in conjunction with the other evidence in the case, leads us to conclude that the jury had ample grounds on which to find that the warning was not "adequate." As an initial matter, the warning pertains to a temporary breathing problem, rather than to the more serious risk of cardiac arrest.

More fundamentally, however, the terms "prolonged" and "continuous" found in the warning are not further defined and, thus, are vague in the absence of further clarification, which was not provided by TI. Instead, TI's Chief Executive Officer Patrick Smith conceded during his testimony that TI did not give "precise guidance" to users of the X26 taser concerning "the safe length of a discharge cycle." Smith further testified that "we don't set a hard and fast limit," and agreed that "[a] cop can't look and say, don't go beyond 15 seconds or 20 or 30 or 40 or anything like that."

Additionally, a jury also could conclude that the warning's "whenever practicable" clause rendered the warning vague and inadequate. Captain Campagna testified that he interpreted the "whenever practicable" language to mean that the taser could be applied continuously until the suspect fell to the ground or otherwise was secured. Likewise, Officer Dawson testified that he did not think that it was "practicable" to release the taser's trigger while Turner remained standing in defiance of a

34

command to "get down." Thus, based on the present record, TI's warnings concerning prolonged application of the X26 taser cannot be deemed "adequate" as a matter of law under Section 99B-4(1). Accordingly, we hold that the district court did not err in denying TI's motion for judgment as a matter of law on the issue of product misuse.[13]

### D.

Finally, we consider TI's argument that the district court's remittitur decision resulted in an excessive award that was not supported by the evidence.[14] TI contends that Fontenot failed to prove to a reasonable level of certainty her entitlement to an award of that amount. Fontenot argues in opposition that the damages at issue in this case are not

---

[13] We are not persuaded by TI's reliance on Marquez v. City of Phoenix, 693 F.3d 1167, 1172-73 (9th Cir. 2012), in which the Ninth Circuit held that TI's warnings concerning the X26 taser were adequate and "capture[d] the circumstances of [that] case." Among other distinguishable facts, at issue in Marquez was the repetitive use of the X26 taser, rather than the duration of the continuous taser use that is at issue here. Notably, the police officers in Marquez pulled the taser's trigger 22 times, and the record was unclear concerning the total duration for which Marquez was subjected to the taser's electrical current. Id. at 1171-72.

[14] As discussed previously, the district court reduced the jury's initial award of $10 million in compensatory damages to $7.5 million, further remitted the award to about $6.15 million after accounting for present value, and reduced that total to about $5.5 million after deducting money Fontenot received from Food Lion's workers compensation fund and the City of Charlotte.

35

capable of precise measurement, and that the district court acted within its discretion in its decision on the remittitur.

We review for abuse of discretion a district court's decision with respect to a motion alleging that a jury's compensatory damages award is excessive as a matter of law. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 435–39 (1996); Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 280 (4th Cir. 1999). In a diversity action, federal courts apply state law standards in considering whether the district court abused its discretion when ruling on a motion relating to a jury's damages award. Konkel, 165 F.3d at 280-81. In undertaking this review, we give "the benefit of every doubt to the judgment of the trial judge." Id. (citation omitted).

In the present case, Fontenot sought compensatory damages under North Carolina General Statutes Section 28A-18-2, on behalf of herself and Turner's father whom Fontenot had divorced when Turner was about four years old. In relevant part, that statute allows for "compensation for the loss of the reasonably expected . . . [s]ervices, protection, care and assistance of the decedent," and for the "[s]ociety, companionship, comfort, guidance, kindly offices and advice of the decedent" (collectively, services, care, and companionship), in addition

to hospital and funeral expenses.[15]  N.C. Gen. Stat. § 28A-18-2(b)(4)(b-c).

North Carolina courts recognize that such damages often are not capable of "exact ascertainment." Bowen v. Constructors Equip. Rental Co., 196 S.E.2d 789, 806 (N.C. 1973). Nevertheless, "damages available under the statute are not automatic," and instead "must be proved to a reasonable level of certainty, and may not be based on pure conjecture." DiDonato v. Wortman, 358 S.E.2d 489, 493 (N.C. 1987) (emphasis added).

As an initial matter, we observe that the only methodology suggested by Fontenot to aid the jury's calculation of compensatory damages was counsel's suggestion that the jury

> take just some arbitrary, small, conservative number, like $1,000 for a week.  Or if we were to take a bigger number like $2,000 for a week of this loss. And multiply it out [over a 40 year life expectancy], being conservative, rounding it down, you would get for each plaintiff, a range of let's say between [$]2 and [$]4 or $5 million.

(Emphasis added.)  In initially reducing the damages award from $10 million to $7.5 million, the district court referenced counsel's suggested methodology in determining the "highest

---

[15]  The statute also allows for the recovery of the decedent's pain and suffering and the net income of the decedent, see N.C. Gen. Stat. § 28A-18-2(b)(2), (b)(4)(a), but Fontenot did not seek such damages in this case.  Additionally, the parties stipulated that Turner's medical and funeral expenses totaled $10,843.52.

amount the jury could have properly awarded," and stated that the evidence supporting damages was "relatively thin."

Notably, Fontenot failed to present any evidence showing that Turner's services, care, and companionship had a value approaching $1000-$2000 per week, per parent. Additionally, there was no testimony concerning whether, and for what duration, Turner's parents reasonably expected Turner to continue providing services such as babysitting his younger siblings and assisting with household chores. Accordingly, Fontenot essentially invited the jury and the district court to engage in the type of "pure conjecture" that North Carolina courts have prohibited. See DiDonato, 358 S.E.2d at 493.

We nonetheless observe that the testimony of Turner's parents demonstrated their close relationships with Turner, as well as Turner's good character. We have no doubt that Turner had significant value to his parents, and that they are entitled to a substantial award for the loss of his services, care, and companionship. However, we cannot agree that the evidence, viewed in the light most favorable to Fontenot, met the required "reasonable level of certainty" to establish that such services, care, and companionship had a monetary value approaching $6.15 million. See id. In reaching a contrary conclusion, the

38

district court abused its discretion.  Accordingly, we hold that TI is entitled to a new trial on damages.[16]

### III.

For these reasons, we affirm the district court's judgment upholding the jury verdict imposing liability on TI for its negligence.  We vacate the district court's judgment with respect to the remitted award of compensatory damages, and we remand the case to the district court for a new trial limited to the issue of damages.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

---

[16] In view of our holding that TI is entitled to a new trial on the issue of compensatory damages, we do not consider TI's additional argument that the district court abused its discretion in declining to give certain jury instructions related to the determination of damages.

TRAXLER, Chief Judge, dissenting:

Because I believe TI was entitled to judgment as a matter of law on the basis of contributory negligence, I respectfully dissent.[1]

We review the denial of a judgment as a matter of law de novo. See Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999). We must grant judgment as a matter of law against a party on a claim when she "has been fully heard" on that claim and "a reasonable jury would not have a legally sufficient evidentiary basis to find" in her favor. See Fed. R. Civ. P. 50(a). "Because we are sitting in diversity, our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." Horace Mann Ins. Co. v. General Star Nat'l Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008). When a state's highest court has not directly spoken to an issue, decisions of the state's intermediate appellate court "constitute the next best indicia of what state law is, although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Liberty

---

[1] In moving for judgment as a matter of law at the close of the plaintiff's case and renewing that motion at the close of defendant's case and after the jury verdict, TI consistently relied on its argument that, as a matter of law, Turner's contributory negligence barred any liability. See Fed. R. Civ. P. 50.

40

Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992) (internal quotation marks omitted).

In North Carolina, "[e]very person having the capacity to exercise ordinary care for his own safety against injury is required by law to do so, and if he fails to exercise such care, and such failure, concurring and cooperating with the actionable negligence of defendant, contributes to the injury complained of, he is guilty of contributory negligence." Clark v. Roberts, 139 S.E.2d 593, 597 (N.C. 1965). Thus, under North Carolina common law, no recovery may be had in tort for the plaintiff's injuries when his failure to exercise reasonable care is a proximate cause of his injuries. See Holderfield v. Rummage Bros. Trucking Co., 61 S.E.2d 904, 906 (N.C. 1950).[2]

Here, after being fired for insubordination, Turner refused to leave the store, even when Blackert told him she was calling the police. When store manager Antwan Wesley arrived at the store, Turner began yelling and cursing at him and aggressively advancing on him like he wanted to fight. As Wesley retreated, Turner slung a display and threw an umbrella.

---

[2] North Carolina is one of only four states – and the District of Columbia – that continue to adhere to this all-or-nothing doctrine. Most states have instead adopted a system of comparative negligence, which apportions damages between a negligent plaintiff and negligent defendant according to their relative degree of fault rather than completely barring the negligent plaintiff's recovery. See Coleman v. Soccer Ass'n of Columbia, 69 A.3d 1149, 1160 & n.3 (Md. 2013).

41

Responding to Blackert's call, Charlotte-Mecklenburg Police Officer Dawson then entered the store. As Turner pivoted and saw Dawson walking toward him with his X26 unholstered, Turner said, "F**k the police," and turned back to Wesley. J.A. 650 (internal quotation marks omitted). Dawson told Turner to calm down, but Turner continued to act "very aggressively" toward Wesley with "his hands clenched, his fists balled up" as if "he was getting ready to lunge at him." J.A. 313-14. Turner then turned toward Officer Dawson, and walked toward him with a "swaggerly, macho type of a walk," looking like he was going to fight Officer Dawson. J.A. 607.

Dawson aimed his X26 at Dawson. Turner looked down, saw the laser dot on his chest, but continued to step toward Dawson with his fists clenched. As Turner got within 3-5 feet of Dawson, Dawson deployed his Taser and the probes struck Turner near the sternum. Even then, Turner refused to submit. Rather, he continued walking and picked up a metal bag rack and threw it. Attempting to protect himself and the store customers, Dawson continued to hold the trigger down as Turner continued to refuse Dawson's commands to get down. Turner eventually collapsed and died from ventricular fibrillation.

Several cases from the North Carolina Court of Appeals with facts analogous to ours demonstrate as a matter of North Carolina law that Turner was contributorily negligent in

42

continuing his aggressive behavior even after the officer told him to calm down and even after he drew his Taser and pointed it at Turner. Most relevant is Braswell v. N.C. A&T State University, 168 S.E.2d 24, 30-31 (N.C. Ct. App. 1969), wherein the court applied the doctrine of contributory negligence to reverse a damage award made by the North Carolina Industrial Commission. In that case, the plaintiff had joined a mob that was attempting to force gymnasium doors open at a public dance, and he was accidentally struck by a ricocheted bullet fired by a campus security officer. The North Carolina Court of Appeals concluded as a matter of law that the plaintiff was contributorily negligent and that his negligence was a proximate cause of his injuries:

> It seems to us that it was reasonably foreseeable that the security officer would undertake to perform his duty to prevent an illegal breaking and entry of the building, and that someone in the crowd was likely to be injured in the process. It also seems that a reasonably prudent person, in the exercise of due care for his own safety, would not participate in mob action which was clearly intended to be in violation of the law and contrary to reasonable conduct. Every person is charged with the duty of exercising reasonable care for his own safety, and the joining in illegal mob action is not an exercise of reasonable care; in so doing plaintiff assumed the risk of whatever injury he might receive as a result. In addition, the illegal conduct of the mob of which the plaintiff was voluntarily a part was such as would reasonably be calculated to provoke the security officer into taking some action to disperse the mob.

> We think the facts, as found by the Commission, give rise to one inference only, and that is-that the

43

plaintiff was contributorily negligent in joining and rejoining the crowd. He knew they were acting in an unruly and unlawful manner and that the officer had warned them to stop trying to break in the doors. With this knowledge, he voluntarily became a member of the crowd on two occasions, and was rejoining the crowd a third time when he was shot. We think these facts point to only one conclusion; that is, the plaintiff was contributorily negligent as a matter of law.

Id. at 30-31 (emphasis added).[3]  The very same reasoning applies here.  By continuing to act in a hostile manner, including

---

[3]  In the context of the discussion of why the plaintiff's contributory negligence barred recovery, Braswell stated that by joining the mob, "plaintiff assumed the risk of whatever injury he might receive as a result." Braswell v. N.C. A&T State Univ., 168 S.E.2d 24, 31 (N.C. Ct. App. 1969). However, by use of the words "assumed the risk," the Braswell court plainly did not intend to invoke a legal doctrine separate from contributory negligence.  Rather, the sentence in question merely reflects that a "[p]laintiff may be contributorily negligent if his conduct ignores unreasonable risks or dangers which would have been apparent to a prudent person exercising ordinary care for his safety." Jenkins v. Lake Montonia Club, Inc., 479 S.E.2d 259, 263 (N.C. Ct. App. 1997) (holding that, as a matter of law, contributory negligence barred a plaintiff's recovery from injuries from hitting his head on the bottom of a swimming area after diving off a slide when "[t]he danger of striking the bottom of the swimming area when diving head first into shallow water was obvious to plaintiff"); see also Dalrymple v. Sinkoe, 53 S.E.2d 437, 440 (N.C. 1949) (in analyzing claim of contributory negligence, stating that "a buyer who uses the article after he discovers [that the article is not safe to use in the manner he is using it] will be held to have assumed all the risk of damage to himself, notwithstanding the seller's assurance of safety"); Deaton v. Board of Trustees of Elon College, 38 S.E.2d 561, 565 (N.C. 1946) ("'It has been repeatedly held that where one knowingly places himself in a place of danger which he might easily have avoided he assumes all the risks incident thereto.'").  That is exactly the way in which TI has consistently argued that Turner was contributorily negligent: Like the plaintiff in Braswell, Turner's conduct
(Continued)

44

saying "F**k the police" when Officer Dawson walked in, J.A. 309, 650, continuing to act "very aggressively" toward Wesley with "his hands clenched, his fists balled up" as if "he was getting ready to lunge at him," J.A. 313-14, walking toward Officer Dawson with a "swaggerly, macho type of a walk" looking like he was going to assault Dawson, J.A. 607, and then refusing to submit even when he was being shocked with the X26, Turner took unreasonable actions that a reasonable person would realize would prompt a physical response – and then a further physical response – from Officer Dawson. By virtue of this negligence, Turner "assumed the risk of whatever injury he might receive as a result." Braswell, 168 S.E.2d at 31; cf. Benton v. Hillcrest Foods, Inc., 524 S.E.2d 53, 58 (N.C. Ct. App. 1999) (holding that when plaintiffs engaged others with belligerent, confrontational behavior, failed to leave restaurant when they had the opportunity to avoid escalation of physical violence, and then were injured in the resulting confrontation, it gave rise to reasonable inference that plaintiffs were contributorily negligent in a lawsuit against restaurant's owner and franchisor); see also Hinton v. City of Raleigh, 264 S.E.2d 777, 779 (N.C. Ct. App. 1980) (affirming summary judgment against

_____

ignored the risk that the officer would hurt him in attempting to respond to his reckless conduct.

45

plaintiff robbery suspect when suspect committed armed robbery, refused to surrender when ordered by police, moved aggressively toward a police officer, and was later shot by that officer).

Fontenot argues that any negligence by Turner was not the proximate cause of his injuries because the particular hazard that befell him – having his heart stopped by the X26 – was unforeseeable to someone in his position. However, although foreseeability of injury is an essential element of proximate cause, "[i]t is not required that the injury in the precise form in which it occurred should have been foreseeable but only that, in the exercise of reasonable care, consequences of a generally injurious nature might have been expected." McNair v. Boyette, 192 S.E.2d 457, 461 (N.C. 1972) (emphasis added); see also Braswell, 168 S.E.2d at 31 ("[T]he joining in illegal mob action is not an exercise of reasonable care; in so doing plaintiff assumed the risk of whatever injury he might receive as a result."). Here, Turner obviously knew Officer Dawson had pulled out his Taser, focused its laser sight on Turner's chest, and was prepared to shoot Turner with enough electrical current to cause his collapse if necessary, yet in the face of all this Turner continued to advance on the officer in a hostile manner. Certainly it was foreseeable, if not obvious, that Turner would be injured by the officer's response.

46

Fontenot next contends that regardless of how the doctrine of contributory negligence would apply in a non-products-liability case, language in the North Carolina Products Liability Act ("the Act") prevents application of the doctrine here. The plaintiff contends that any contributory negligence on Turner's part in the fatal incident cannot be a defense to the products liability action against the Taser manufacturer because Turner was not the user of the product, the Taser. I disagree. The North Carolina General Assembly adopted the Act, which added the new Chapter 99B to the North Carolina Code, effective October 1, 1979. See 1979 N.C. Sess. Laws Ch. 654. The Legislative Research Commission, which was directed by the General Assembly to study the law, explained that the comprehensive legislation was designed to protect manufacturers, retailers, and wholesalers from "rapidly escalating premiums for products liability insurance and [the] potential non-availability of such coverage . . . [b]y codifying North Carolina's case law, removing uncertainty in the statutes of limitations for products liability actions, and by establishing an absolute time after the purchase of a product beyond which no action can be maintained." Product Liability Report to the 1981 General Assembly at 2 (Jan. 14, 1981).

47

N.C.G.S. § 99B-4 concerns the doctrine of contributory negligence in products liability cases. As originally enacted, it provided:

> No manufacturer or seller shall be held liable in any product liability action if:
>
> (1) the use of the product giving rise to the product liability action was contrary to any express and adequate instructions or warnings delivered with, appearing on, or attached to the product or on its original container or wrapping, if the user knew or with the exercise of reasonable and diligent care should have known of such instructions or warnings; provided, that in the case of prescription drugs or devices the adequacy of the warning by the manufacturer shall be determined by the prescribing information made available by the manufacturer to the health care practitioner; or
>
> (2) the user discovered a defect or unreasonably dangerous condition of the product and was aware of the danger, and nevertheless proceeded unreasonably to make use of the product and was injured by or caused injury with that product; or
>
> (3) <u>The claimant failed to exercise reasonable care under the circumstances in his use of the product</u>, and such failure was a proximate cause of the occurrence that caused injury or damage to the claimant.

See 1979 N.C. Sess. Laws Ch. 654 (emphasis added).[4] Effective January 1, 1996, the legislature amended the Act in several respects. As is relevant here, § 99B-4(3) was changed as follows:

---

[4] "'Claimant' means a person or other entity asserting a claim and, if said claim is asserted on behalf of an estate, an incompetent or a minor, 'claimant' includes plaintiff's decedent, guardian, or guardian ad litem." N.C.G.S. § 99B-1(1).

48

(3) The claimant failed to exercise reasonable care under the circumstances in ~~his~~the use of the product, and such failure was a proximate cause of the occurrence that caused the injury or damage ~~to the claimant~~complained of.

1995 N.C. Sess. Laws Ch. 522.

Consistent with the General Assembly's intention in enacting the Act, the North Carolina Supreme Court has consistently held that the effect of § 99B-4(1) and (3) – in their pre-amendment form – was "merely [to] codify the doctrine of contributory negligence as it applies in" products liability actions, and to "set[] out or explain[] more specialized fact patterns which would amount to contributory negligence in a products liability action." Champs Convenience Stores, Inc. v. United Chem. Co., 406 S.E.2d 856, 860 (N.C. 1991). Thus, the court has emphasized that "[i]n a product liability action founded on negligence, there is no doubt that plaintiff's contributory negligence will bar his recovery to the same extent as in any other negligence case." Smith v. Fiber Controls Corp., 268 S.E.2d 504, 506 (N.C. 1980) (alterations omitted).

Drawing on the language of § 99B-4(3), Fontenot maintains that because the statute refers to a claimant "fail[ing] to exercise reasonable care under the circumstances in the use of the product," a claimant can be found contributorily negligent in a products liability case only if he used the product. Fontenot argues that if we do not construe "in the use of the

49

product" to limit the type of negligence on the part of a claimant that can bar recovery, we are essentially reading that language out of the statute. Were we writing on a clean slate, Fontenot's proposed construction might have some appeal. Unfortunately for Fontenot, however, her argument is clearly in conflict with the North Carolina Supreme Court, which has construed the statute as merely codifying preexisting common law rules and establishing their application in certain particularized fact patterns without making any new rules for products liability cases. Indeed, we have already rejected a construction very similar to the one Fontenot urges on this basis and so has the North Carolina Supreme Court. See Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712 (4th Cir. 1995); Nicholson v. American Safety Util. Corp., 488 S.E.2d 240 (N.C. 1997) ("Nicholson II").

In Jones, the plaintiffs worked for many years for a plant that manufactured a product insulated with asbestos. Exposed to asbestos on a daily basis, the plaintiffs eventually developed asbestosis and lung cancer and later filed products liability suits against the asbestos manufacturer. The district court consolidated the cases and granted partial summary judgment to the plaintiffs on the issue of whether they could be held contributorily negligent as a result of their long-term smoking. When the plaintiffs later prevailed on their claims at trial,

50

the defendant appealed, arguing, as relevant here, that the district court erred in granting partial summary judgment on the contributory negligence issue.

We reversed the judgment. In so doing, we considered the argument that § 99B-4(3)'s reference to a plaintiff's "fail[ure] to exercise reasonable care under the circumstances in his use of the product" demonstrated that in products liability actions a plaintiff's negligence can only bar recovery if it is the plaintiff's use of the product that is negligent. See id. at 719-22. We noted, however, that the North Carolina Supreme Court has held that § 99B-4(3) "'reaffirms the applicability of contributory negligence as a defense in product liability actions'" and "'merely codifies the doctrine of contributory negligence as it applies in actions brought under Ch. 99B.'" Id. at 719 (quoting Smith, 268 S.E.2d at 510, and Champs, 406 S.E.2d at 860) (alteration omitted). We therefore concluded that "the statutory focus [of § 99B-4(3)] is not . . . merely on [the plaintiffs'] 'use of the product' per se" but rather on whether they "'failed to exercise reasonable care under the circumstances in [their] use of the product.'" Id. at 721-22 (emphasis omitted) (final alteration in original). We observed that our interpretation was "based on the plain language of the entire statute . . . and the definitive interpretation placed thereon by the North Carolina Supreme Court, not on certain

51

statutory language read in isolation." Id. at 721. Because under the plaintiffs' own theory of the case, their smoking combined with their asbestos exposure "'synergistically'" to substantially increase their risk of getting lung cancer, we concluded that their long-term smoking could be found to be contributory negligence barring their recovery. Id. at 720.

Citing Jones with approval, the North Carolina Supreme Court reached a similar conclusion on similar facts in Nicholson II. In that case, the plaintiff, an electrical lineman, was working on a project extending an overhead power line. He was wearing a protective helmet and safety gloves, but his helmet blew off multiple times and he eventually decided to continue to work without retrieving it. When an energized line either touched or came close to touching his unprotected head, he was severely injured. In a products liability action against the manufacturer and distributor of the gloves, the trial court granted summary judgment against the plaintiff, concluding, as is relevant here, that recovery was barred as a matter of law under the doctrine of contributory negligence because of his continuing to work after he lost his helmet. See id. at 243.

On appeal to the North Carolina Court of Appeals, plaintiff maintained that "contributory negligence does not apply unless plaintiff's use of the gloves was unreasonable under the circumstances, regardless of any alleged failure otherwise to

52

employ safety devices and act in an appropriate manner." Nicholson v. American Safety Util. Corp., 476 S.E.2d 672, 679 (N.C. Ct. App. 1996) ("Nicholson I"). The Court of Appeals agreed based on its construction of § 99B-4(3) and further noted that "in the cases before our Courts in which contributory negligence under G.S. 99B-4 has been alleged, all have involved the plaintiff's use of the alleged defective product." Id. at 679-80. In light of the fact that none of the plaintiff's alleged contributory negligence actually concerned the manner in which he used the gloves, the court reversed the grant of summary judgment on contributory negligence. See id. at 680.

The North Carolina Supreme Court then granted discretionary review and unequivocally rejected the construction given the statute by the intermediate appellate court. See Nicholson II, 488 S.E.2d at 241. The North Carolina Supreme Court noted, as we did in Jones, that it had previously construed § 99B-4(3) merely to codify common law contributory negligence rules for actions brought under the new § 99B and that it did "not create a different rule for products liability actions." Id. at 244; see id. at 243. The court therefore held, as we did, that § 99B-4(3) "does not limit the [contributory negligence] defense to the plaintiff's misuse of the product." Id. at 241.

The argument Fontenot makes to us now fails for the very same reasons that the plaintiffs' arguments failed in Jones and

53

Nicholson II. The North Carolina Supreme Court has consistently held that § 99B-4 merely codifies generally applicable common law rules and explains how those rules apply in particular factual scenarios but does not make special rules for products liability cases.[5] Those generally applicable common law rules dictate that no recovery may be had when a plaintiff's negligence was a proximate cause of his injuries. Whether the claimant used the product or had it used on him makes no difference.[6]

---

[5] Fontenot identifies language in § 99B-4(3) that, when read in isolation, might suggest that only a plaintiff's use of the defective product may constitute contributory negligence. However, the language Fontenot identifies is even less supportive of her position than the language that existed in the pre-amendment version of the statute that the Jones and Nicholson II courts considered. While the original version barred recovery when "[t]he claimant failed to exercise reasonable care under the circumstances in his use of the product, and such failure was a proximate cause of the occurrence that caused injury or damage to the claimant," the amended version bars recovery when "[t]he claimant failed to exercise reasonable care under the circumstances in the use of the product . . . ." 1979 N.C. Sess. Laws Ch. 654 (emphasis added); 1995 N.C. Sess. Laws Ch. 522 (emphasis added); see Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712, 721 (4th Cir. 1995) (observing that our conclusion that the focus of § 99B-4(3) was not on the plaintiff's use of the product was "based on the plain language of the entire statute . . . and the definitive interpretation placed thereon by the North Carolina Supreme Court, not on certain statutory language read in isolation").

[6] Fontenot asserts that the fact that no cases have applied contributory negligence under North Carolina law to bar recovery when the plaintiff was not the user of the product indicates that North Carolina courts would not apply the doctrine in that
(Continued)

Fontenot identifies certain language from the opinions in *Jones* and *Nicholson II* that she contends supports her position that only circumstances during the plaintiff's use of the product may constitute contributory negligence in products liability cases. See *Jones*, 69 F.3d at 722 ("the statute requires the focus to be on whether [plaintiffs] 'failed to exercise reasonable care under the circumstances in [their] use of the product") (emphasis added and omitted); *Nicholson II*, 488 S.E.2d at 244 ("[A]ll of the circumstances during the plaintiff's use of the product must be considered." (emphasis added)). Again, however, context is key. In concluding that all of the plaintiff's conduct during his use could be considered, the *Jones* and *Nicholson II* courts were merely rejecting the proposition that only some of that conduct – namely, "plaintiff's conduct with respect to the product itself" – could be considered. *Nicholson II*, 488 S.E.2d at 244. This language plainly was not intended to describe the outer

---

circumstance. However, this fact is no more dispositive than it was in *Nicholson I*. See 476 S.E.2d 672, 679 (N.C. Ct. App. 1996) ("[I]n the cases before our Courts in which contributory negligence under G.S. 99B-4 has been alleged, all have involved the plaintiff's use of the allege defective product."). It simply reflects that North Carolina has not been called upon to decide a case with those particular facts. TI can just as easily make the point that there is no case refusing to apply contributory negligence under North Carolina law on the basis that the plaintiff was not the user of the product.

boundaries of what conduct can be considered contributory negligence.

In sum, our conclusion in <u>Jones</u> – that § 99B-4 created no new contributory negligence rules in products liability cases, but rather codified the existing common law rules and set out certain fact-pattern applications of those rules – also requires rejection of plaintiff's proposed construction in this case. And, even were we not bound by <u>Jones</u>, the North Carolina Supreme Court's decision in <u>Nicholson II</u> also makes it clear that that court would reject plaintiff's proposed construction as well.[7] For these reasons, I believe the district court erred in denying TI's motion for judgment as a matter of law. I respectfully dissent from the majority's contrary holding.

---

[7] Because officers generally use their Tasers only against suspects who are acting unreasonably, it is true that North Carolina's contributory negligence rule would usually prevent recovery under a negligence theory for these suspects' resulting injuries. However, that is simply the consequence of North Carolina's hard, all-or-nothing contributory negligence rule. It is not for us to judge the wisdom of North Carolina's rule from a policy standpoint, but only to apply it.